[No. H034019. Sixth Dist. Sept. 3, 2010.]

CAROL C. MANSON, as Trustee, etc., Plaintiff and Appellant, v.
CINDY DENISE SHEPHERD et al., Defendants and Appellants.

[CERTIFIED FOR PARTIAL PUBLICATION*]

*Pursuant to California Rules of Court, rule 8.1105(c), this opinion is ordered published in
the Official Reports with the exception of part IV.

**COUNSEL**

Hopkins & Carley, Ellen McKissock and Allonn E. Levy for Plaintiff and Appellant.

Plageman, Lund & Cannon, Richard W. Lund and Shana Margolis Goldberg for Defendants and Appellants.

OPINION

BAMATTRE-MANOUKIAN, Acting P. J.—

## I. INTRODUCTION

After the death of her husband, Maynard F. Manson, appellant Carol C. Manson became the sole trustee of the Maynard F. Manson and Carol C. Manson Revocable Living Trust (the Trust).[1] In addition to being the trustee and the sole income beneficiary of the Trust, Carol is the president of the Trust's primary asset, Wave Crest Development, Inc. (Wave Crest), and the chair of Wave Crest's board of directors. The Trust owns 100 percent of Wave Crest's shares, which Carol votes. During her administration of the Trust, Carol submitted a trustee's petition for settlement of first account and report and approval of attorney fees. Respondents, who are Maynard's four daughters from a prior marriage and remainder beneficiaries of the trust, objected to the petition.

After a court trial, the trial court issued a February 9, 2009 order approving the trustee's accounting, with two exceptions. One exception is the subject of Carol's appeal. She contends that the trial court misinterpreted Probate Code section 16350, subdivision (d)(1)(A)[2] when it allocated to principal, rather than income, a $3 million dividend paid by Wave Crest to the Trust. On cross-appeal, respondents challenge the trial court's approval of the trustee's allocation to principal of a charge for $39,293.63 in expenses, a charge for $122,878.16 in interest on the trustee's personal loan to the Trust, and a charge for attorney fees that respondents contend were unrelated to Trust administration.

After carefully reviewing the parties' contentions on appeal and cross-appeal, for the reasons stated below we will affirm the trial court's order.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Trust*

Maynard and Carol married on June 14, 1978. Their estate planning included a postnuptial agreement, dated May 25, 1995, that provided that all of their assets would be held as separate property. The postnuptial agreement also provided that all property acquired by them, with the exception of gifts

---

[1] Hereafter, we will refer to Carol C. Manson (Carol) and Maynard F. Manson (Maynard) by their first names for purposes of clarity and not out of disrespect.

[2] All statutory references hereafter are to the Probate Code unless otherwise stated.

and inheritances, would be held as two-thirds Maynard's separate property and one-third Carol's separate property.

Maynard and Carol's estate planning also included the Trust. At the time the Trust was created by a written declaration of trust on June 1, 1995, Maynard and Carol were the trustors and trustees. The Trust was subsequently amended by the first amendment to the Trust, dated May 19, 2000, and the second amendment to the Trust, dated February 3, 2005.

Of significance in the present case is the Trust provision requiring that property transferred to the Trust would, absent written specification to the contrary, be considered two-thirds the separate property of Maynard and one-third the separate property of Carol. Also significant is the Trust provision requiring that, upon the death of the predeceasing trustor, the Trust estate would be divided into three trusts, designated "Trust A," "Trust B," and "Trust C."

Accordingly, if Maynard predeceased Carol, the Trust provided that Trust C (the survivor's trust) would consist of Carol's separate property included in the Trust estate, plus their primary residence. Trust B (the bypass trust) and Trust A (the marital trust), would consist of Maynard's separate property assets included in the Trust estate. Maynard died on May 5, 2005. At the time of the proceedings at issue here, Trusts A, B, and C had not been funded.

Following Maynard's death, Carol became the sole trustee and sole income beneficiary[3] of the Trust and of the three subtrusts, Trusts A, B, and C. Additionally, the Trust provides that Carol is entitled to as much of the principal of Trust C, the survivor's trust, as she may request. She may also access the principal of Trusts A and B if, in her capacity of trustee, she deems her net income from Trusts A and B to be insufficient to maintain her accustomed standard of living.

Trusts A and B became irrevocable upon Maynard's death. The remainder beneficiaries of the Trust, to whom the assets of Trusts A and B are to be distributed upon Carol's death, include, among others, Maynard's four daughters from a prior marriage: Cindy Denise Shepherd, Marcy Victoria Kohler, Monica Joy Melrose, and Parise Sylvia Manson Pak (hereafter, collectively respondents).

---

[3] Section 16325 provides that " 'Income beneficiary' means a person to whom net income of a trust is or may be payable."

## B. *The Petition*

On February 4, 2008, Carol, as trustee, filed a petition for settlement of first account and report and approval of attorney fees (the petition), pursuant to sections 1061 to 1064 and section 17200.[4] The accounting attached to the petition listed the Trust's property, receipts, disbursements and losses for the period of March 3, 2005, through November 27, 2007, which included Maynard's death of May 5, 2005. The accounting also indicated that the value of the Trust estate as of November 27, 2007, was $46,377,702.07.

Of particular importance in the present case is the accounting of receipts, which states that on March 30, 2007, the Trust received a dividend from Wave Crest in the amount of $3 million. The declaration of the Trust's attorney, James V. Quillinan, filed on September 15, 2008, notes that the amended accounting allocated the $3 million Wave Crest distribution as follows: $560,936 to principal and $2,439,064 to income.

Additionally, the petition sought court approval for the Trust to pay the law firm of Hopkins & Carley attorney fees in the amount of $561,147.89, which Carol had advanced for legal services rendered in connection with the Trust. Carol deferred her right to seek court approval for reasonable compensation for her services as trustee.

Respondents filed objections to the petition on July 16, 2008. Their chief objection was to the allocation of 82 percent of the $3 million Wave Crest distribution to income. Respondents stated that they were "informed and believe that all or most of the Three Million Dollar ($3,000,000) dividend was derived from the sale of the High Street property, a principal asset, and thus the dividend constitutes a return of capital and a partial liquidation of the corporation. As such, it should have been allocated entirely to principal or at a much greater percentage."

Respondents also made the following objections to the petition: the disbursements for the expenses of Trust administration and Carol's personal residence should have been charged to income; the disbursements for Wave Crest, a corporation wholly owned by the Trust, should not have been made

---

[4] Sections 1061 to 1064 concern the requirements for the accounting and the petition for approval of the accounting. Section 17200, subdivision (a) provides, "Except as provided in Section 15800, a trustee or beneficiary of a trust may petition the court under this chapter concerning the internal affairs of the trust or to determine the existence of the trust." Subdivision (b)(5) of section 17200 provides "Proceedings concerning the internal affairs of a trust include, but are not limited to, proceedings for any of the following purposes: [¶] . . . [¶] . . . Settling the accounts and passing upon the acts of the trustee, including the exercise of discretionary powers."

from the Trust; the distributions related to a property in Maynard's estate, Pilkington LLC, should have been charged to income; the distributions and disbursements related to Maynard's separate property debt (known as the "TKO Loan Guarantee") were improperly made from principal; Carol improperly distributed principal derived from the sale of Trust assets to herself; and Carol improperly sought approval of the Trust's payment of legal fees that have not been shown to be reasonable or that relate to non-Trust matters such as the probate estate, Wave Crest, and Carol's personal matters. Respondents also claimed that there were numerous irregularities in the accounting.

### C. The Court Trial

A court trial on the petition was held on September 22 and 23, 2008. The parties submitted trial briefs arguing the issues to be decided at the trial. In her brief, Carol responded to respondents' objections to the accounting, asserting that all of the Trust transactions, disbursements and allocations were proper. Respondents raised the same issues in their trial brief that they had raised in their objections to the petition.

Our summary of the evidence presented at the trial focuses on the issues raised on appeal and cross-appeal: the trial court's allocation to principal of the $3 million Wave Crest distribution and the trial court's approval of the trustee's allocation to principal of charges for expenses, interest paid to Carol on her personal loan to the Trust, and attorney fees that respondents contend were unrelated to Trust administration.

### 1. The $3 Million Distribution

Much of Carol's testimony concerned the $3 million Wave Crest distribution. Wave Crest is a real estate investment corporation that is the Trust's primary asset. The Trust owns 100 percent of Wave Crest's shares and Carol is its president and the chair of the board of directors. She also oversees Wave Crest's daily operations. At the time of Maynard's death, Wave Crest was valued at approximately $41 million.

The $3 million dividend that Wave Crest approved on March 1, 2007, for issuance to the Trust was the first dividend ever issued by Wave Crest. Carol was present at the Wave Crest board meeting held on February 28, 2007, and continued to March 1, 2007, where the dividend was discussed. During the meeting, Carol told the board of directors that in her capacity as trustee she would pay back the money that the Trust owed to Wave Crest from the dividend. Carol understood from the presentation made to the board by Michael Blas, the accountant and adviser for the Trust and Wave Crest, that the source of the dividend would be Wave Crest's "cumulative business." She

denied that the only source of the $3 million dividend was the proceeds of the sale of a Wave Crest property known as "High Street," explaining that "High Street did give cash, the sale of that [sic], but there were all kinds of other activities happening in Wavecrest that contributed to have the board of directors finally decide that it was healthy enough to make a dividend." She relied on her advisers in deciding how to allocate the $3 million dividend between Trust principal and income.

Michael Blas testified that he and the law firm of Hopkins & Carley prepared the Trust accounting that was before the trial court for approval. He also prepared a flowchart for the Wave Crest board of directors that pertained to the $3 million dividend paid to the Trust, and was present at the meeting where the board reviewed the flowchart and voted on the dividend. In conjunction with his flowchart presentation, Blas informed the board that "there was $3 million that . . . could possibly be excess cash that was available for the board to review . . . ."

Blas's flowchart, which was admitted into evidence, states that under "Step 2," "Board Declares Dividend to Trust A & B & Carol's of $3,000,000 from High Street sale," "Trust A & B gets $2,000,000" and "Carol's Trust gets $1,000,000." The minutes of the Wave Crest board meeting regarding a $3 million dividend, which were also admitted into evidence, state, "The Board discussed the proceeds from the sale of High Street. After a presentation and outline made by Michael Blas . . . the Board was advised by the Trustee, Carol Manson that upon having available cash, the Trust would immediately repay the existing indebtedness to Wave Crest which was approximately $978,000 . . . . After Board discussion with Carol Manson abstaining, there was a motion and unanimous vote by remaining Board Members to make a $3,000,000 dividend to be made by Wave Crest to the Trust."

Blas acknowledged that, at the time the dividend was issued in March 2007, Wave Crest had only $200,000 to $300,000 in cash that came from sources other than the sale of High Street in February 2007. Blas also acknowledged that the Wave Crest financial statement for the period ending March 31, 2007, indicated that Wave Crest had a net operating loss of $1.6 million and had a gain of over $3 million from the sale of an asset. Further, Blas was aware that the yearend financial statement for Wave Crest for the period ending June 30, 2007, showed a net operating loss of approximately $1.8 million.

However, Blas testified that the $3 million dividend was "a culminating event out of the evolving strategic plan that was started almost two years earlier." The strategic plan developed by Blas and the Wave Crest board of directors was intended to improve Wave Crest's cashflow and to retain its net

operating losses, and involved targeting properties that should be renovated, sold or exchanged. One of the properties that was underperforming was High Street, which had a $20,000 negative cashflow. By selling High Street outright, Blas believed that Wave Crest would improve its financial position by receiving "a significant amount of cash" with "very little tax effect to it."

Blas further recalled that Wave Crest's strategic plan involved moving from status as a C corporation to an S corporation,[5] which would require Wave Crest to "use up" its net operating losses. Wave Crest chose to sell High Street because the sale of that property would generate a significant gain and use up the net operating losses, thereby giving Wave Crest "the greatest amount of benefit . . . ." The amount of the $3 million dividend was based on Carol receiving her separate property share of $1 million, from which she promised that the Trust would pay back approximately $800,000 that the Trust owed to Wave Crest.

Blas denied that the $3 million dividend was declared because High Street had been sold. He explained that High Street "was sold to pay debts. . . . It was just a part of a transaction in a long series of a strategic plan to improve the cash flow [and] the position . . . of not only Wavecrest, [but also] the shareholder and the entire group entity."

Blas also explained that when Maynard was alive, Wave Crest was a development company that "actually developed property, sold those pieces of property, and reinvested in other properties. It had been Maynard's policy as I understand it . . . that he wanted to build up and retain every piece of real estate as best he could . . . . Retention was his goal."

Another accountant, Ross Randall Hopper, was called as a witness on behalf of respondents. His work for respondents included reviewing Wave Crest's financial statements back to 2005 and 2006 and having monthly discussions with Michael Blas regarding Wave Crest. He had also reviewed the accounting that was before the trial court for approval.

After performing an analysis of the source and character of the $3 million Wave Crest dividend, Hopper reached the conclusion that the source of the funds used to distribute the dividend was the sale of High Street. His

---

[5] "A 'general' or 'C corporation' pays tax on its income." (*Handlery Hotels, Inc. v. Franchise Tax Bd.* (1995) 39 Cal.App.4th 1360, 1363 [46 Cal.Rptr.2d 525].) "Generally speaking, federal subchapter S election allows a qualifying 'small business corporation' to avoid paying income tax at the corporate level. (See Int.Rev. Code, §§ 1361(b) & 1363(a).) Instead, each item of corporate income and expense is passed through the 'S corporation' unchanged and reported on a pro rata basis on the tax returns of the individual shareholders of the 'S corporation.' (See Int.Rev. Code, §§ 1363(a) & 1366(b); [citation].)" (*Ibid.*)

conclusion was based upon Wave Crest's financial statements, which indicated that as of March 30, 2007, during the month the dividend was made, Wave Crest had no earnings or profits from the beginning of the year and had losses from business operations. Additionally, Hopper relied upon other Wave Crest financial documents and the Wave Crest board minutes and the presentation to the board regarding the High Street proceeds. He had also received an e-mail from Michael Blas that "described the sale of High Street and the need for an infusion of cash of about $3 million."

Hopper calculated the percentage of Wave Crest's assets that the sale of High Street represented. Based on the June 30, 2006 financial statement, Hopper determined that High Street represented 11.7 percent of Wave Crest's assets. He also believed that the sale of High Street and the distribution of the proceeds to the shareholder was a contraction of Wave Crest's business assets and therefore constituted a liquidation, since the board had elected to distribute the High Street proceeds rather than reinvest in new property or reduce the debt on other property. Hopper acknowledged that there were independent business reasons to liquidate the High Street property because it was an underperforming asset.

### 2. Interest, Attorney Fees, and Expenses

During the relevant accounting period, Carol recalled, the Trust sold two properties known as "McPherson Street" and "Chestnut Street" to Wave Crest. Although the properties were sold in November 2005, Carol did not receive a distribution from the Trust of her one-third share of the proceeds until October 2007. She also received interest of approximately $122,000 on her one-third share in October 2007 because she "had to lend that money back internally into the [T]rust so that it could pay the estate tax that was due." Another portion of the property sale proceeds, in the amount of approximately $1.6 million, was used to pay Maynard's TKO Loan Guarantee that Bank of America had called. TKO was a software company in which Maynard had invested. The Trust also made payments on behalf of a property in Maynard's estate known as Pilkington LLC because, as Carol stated, the "estate had no money."

Blas testified that Maynard bought the real property held by Pilkington LLC by drawing down Wave Crest's $500,000 line of credit and therefore "the original investment in Pilkington LLC didn't actually go through the [T]rust . . . ." The Trust did pay the TKO Loan Guarantee debt to Bank of America that was an obligation of Maynard's estate, because, as Carol repeated, "the estate had no money."

Blas agreed with respondents that approximately $21,020 in expenses had been charged to Trust principal that should have been charged to income. He

also determined that approximately $56,000 in expenses had been charged to income that should have been charged to principal. His opinions depended, however, on the trial court's ruling with respect to allocation between principal and income.

Regarding attorney fees, Carol confirmed that she was requesting that the trial court approve payments of attorney fees from the Trust. She explained that Hopkins & Carley had maintained a separate file for billing attorney fees incurred in connection with the probate of Maynard's estate and those fees had not been submitted to the Trust for payment. Additionally, Carol asserted that the attorney fees paid by the Trust were all related to Trust business, such as the issues involving both the Trust and Wave Crest.

Blas worked for both the Trust and Maynard's estate and did not separate his billing time and his expenses. The Trust paid for all of his work during the accounting period at issue.[6]

### D. *Statement of Decision*

After the court trial concluded, the parties filed a stipulation on October 2, 2008, in which they requested that the trial court delay taking the matter under submission until November 15, 2008, to allow the parties additional time to engage in settlement negotiations. No settlement agreement was reached and on December 10, 2008, the trial court issued its notice of intended decision on the petition.

The notice of intended decision stated that while the general rule under section 16350, subdivision (b) is that a distribution from a corporation should be allocated to income, the trial court found that Wave Crest's $3 million should be allocated to principal under two exceptions to the general rule. The court approved the accounting in all other respects.

On December 22, 2008, respondents requested a statement of decision pursuant to Code of Civil Procedure section 632. They asked the trial court to state the legal and factual basis for the court's decision on three issues: (1) "Whether the Trustee improperly allocated $21,020.68 in routine property maintenance on the three properties owned by the Trust to principal"; (2) "Whether the Trustee improperly charged interest of $122,878.16 on a 'loan' of one-third of the sale proceeds from the Chestnut Street and McPherson Street properties to principal, and, if so, whether the Trustee improperly charged the interest to principal"; and (3) "Whether the Trustee improperly expended Trust funds on attorneys' fees related to the probate estate prior to obtaining court approval."

---

[6] Respondents do not challenge Blas's fees on cross-appeal.

Carol filed a "motion for clarification of intended decision on petition for approval of first account and report of trustee" on December 22, 2008. In the motion, Carol sought "clarification that not only does the Court intend to rule that the accounting should be adjusted to show the reallocation of the corporate distribution to principal, but that the accounting needs to be adjusted to show the reallocation of expenses to principal since insufficient income exists to pay the expenses." She also asked the trial court to clarify that "despite the fact that Wave Crest's 1099 declared 81.8% of the distribution to be income, the Trust and, not Carol Manson individually, shall be required to pay the tax on the entire distribution and Carol Manson will seek a refund from the Internal Revenue Service."

The trial court denied Carol's motion for clarification of the intended decision on February 9, 2009. The order states that "[t]he additional rulings requested in the Motion for Clarification are not appropriate, because the matters as to which clarification is sought are not properly before the Court in the First Account and Report of Trustee."

Carol also filed, on December 24, 2008, a request for statement of decision. She asked the trial court to respond to 15 questions, including questions about the factual and legal basis for the court's ruling that the $3 million Wave Crest distribution should be allocated to principal. In its order of December 29, 2008, the trial court designated respondents as the party to prepare a proposed statement of decision. Thereafter, despite the trial court's order, Carol filed a "Proposal as to the Content of the Statement of Decision" on January 5, 2009, to which respondents objected.

The record on appeal includes Carol's objections to the proposed statement of decision, but does not include the proposed statement of decision itself. Carol objected to the proposed statement of decision to the extent it proposed legal conclusions or factual findings different from those included in her "Proposal as to the Content of the Statement of Decision." On February 9, 2009, the trial court filed its statement of decision, which appears to be respondents' proposed statement of decision with some revisions by the trial court.

## 1. *Ruling on the $3 Million Distribution*

The trial court's statement of decision included several rulings and an order. First, the trial court stated that the "primary issue in this case is whether the Trustee properly allocated the [$3 million] [d]ividend from Wave Crest as primarily income rather than principal." Because the Trust provided no direction regarding the allocation of receipts to the Trust, the trial court determined that the issue was governed by section 16350, subdivision (b),

which states, "Except as otherwise provided in this section, a trustee shall allocate to income money received from an entity." The court further determined that there were two applicable statutory exceptions to the general rule provided by section 16350, subdivision (b).

The first exception was described by the trial court as the " 'indication of partial liquidation' " exception, set forth in section 16350, subdivision (d)(1)(A), which the court determined "requires the trustee to treat a distribution from an entity as principal 'to the extent that the entity, at or near the time of a distribution, indicates that it is a distribution in partial liquidation . . . .' " The second exception was described by the trial court as the " 'statement of source or character' exception" provided by section 16350, subdivision (e), which "allows the trustee to 'rely upon a statement made by an entity about the source or character of a distribution if the statement is made at or near the time of distribution by the entity's board of directors.' "

The trial court ruled that pursuant to the " 'indication of partial liquidation' " exception provided by section 16350, subdivision (d)(1)(A), the $3 million Wave Crest distribution constituted a partial liquidation that, under the statutory mandate, must be entirely allocated to principal. In making this ruling, the trial court relied on several findings of fact regarding the statements and indications by the Wave Crest board around the time the dividend was established: (1) Michael Blas's flowchart (referred to by the court as the "Board Meeting Outline") used the term "liquidation"; (2) the flowchart described the dividend of $3 million as coming from the "High Street sale"; and (3) the flowchart described the character of the funds as "return of capital." The court explained that it viewed these facts in the context of the undisputed evidence, which showed that Wave Crest had a history of not making distributions to shareholders and the dividend was issued after Carol, as trustee, requested funds from Wave Crest so that the Trust could pay its debts.

The trial court further found that the testimony of Carol and Michael Blas that the $3 million distribution came from a variety of sources within Wave Crest to lack credibility, "because it was contradicted by Wave Crest's own documents, including the Board of Director meeting minutes, the outline Mr. Blas prepared for the board meeting presentation, the Trustee's own characterization of the dividend in briefing before this court, and the Wave Crest financial documents." The trial court also found that the testimony of respondents' accounting expert, Ross Hopper, "demonstrated to the satisfaction of the court that the sale of High Street was the only source of the funds for the $3 million dividend." The court also rejected as irrelevant the evidence regarding Wave Crest's subsequent tax reporting of the $3 million dividend.

The trial court concluded that "the Board Meeting Outline stated and indicated to Carol Manson, as Trustee and a Board Member, that the $3 million distribution was from the sale of a principal asset, High Street, that the funds represented a return of capital, and it fit within at least a partial scheme of liquidation of assets."

Alternatively, the trial court ruled that the $3 million Wave Crest distribution should be allocated entirely to principal under the " 'statement of source or character' exception" provided by section 16350, subdivision (e), since "upon the evidence presented [it] would be beyond the bounds of reasonable judgment and inconsistent with the Trustee's fiduciary duties for the Trustee to conclude, if the discretionary determination under section 16350(e) was remanded to her, that the source or character of this distribution was anything other than a distribution of principal resulting from the sale of Wave Crest's High Street property."

### 2. *Ruling on the Allocation of Expenses*

Regarding respondents' contention that Carol improperly allocated $21,020.68 in expenses to principal, rather than income, the trial court noted that Carol had admitted at trial that she had "inadvertently charged these expenses to principal and they should have been charged to income." However, the trial court found that "the error with respect to the allocation of $21,020.68 in expenses to principal was offset by other expenses incorrectly allocated to income, such that the Trustee's allocation of $21,020.68 in expenses to principal is approved."

### 3. *Ruling on Interest Payments*

The trial court also rejected respondents' claim that Carol had improperly allocated a charge for $122,878.16 in interest expense to principal, after making several factual findings.

Based on the trial evidence, the trial court found that Carol had left her one-third share of the proceeds from the sale of the Chestnut Street and McPherson Street properties in the Trust to pay Trust debts, rather than funding the survivor's trust (Trust C) or withdrawing the proceeds. The court further found that Carol had characterized her "one-third proceeds as a loan to the Trust and charged interest at the rate of prime plus 1%. Total interest of $122,878.16 was paid to [Carol] at the time the Trust had sufficient funds to pay the one-third share of the proceeds plus interest. The interest was allocated to the principal of the Trust."

The trial court ruled that Carol "was permitted to loan the proceeds of the sale of her separate property to the Trust and to charge interest on that

amount as well as charge the interest to principal." However, the court did not state the legal basis for its ruling.

### 4. *Ruling on Attorney and Accountant Fees*

On these issues, the trial court ruled as follows: "Respondents contested the expenditure of attorney's fees related to Pilkington Meadows LLC, the TKO Loan Guarantee, and Maverick Ventures, and accountant fees paid to Mr. Blas as being probate related and improperly paid prior to [Carol] seeking court approval thereof. [Carol] testified at trial that a separate file and billing number was maintained by her attorneys related to the probate of the Estate of Maynard Manson and none of those charges have been invoiced to her or paid. This Court approves the expenditure of the contested fees."

### E. *The Trial Court's Orders*

The February 9, 2009 statement of decision includes several orders regarding the Trust accounting: (1) the $1 million in income distributed to Carol as her one-third share of the $3 million Wave Crest distribution "shall be recharacterized as a distribution of principal and allocated to Carol Manson's survivor's trust once that trust is funded"; (2) "[t]he 'Income Transactions' schedule of the Accounting shall be adjusted to show a negative balance for the 'Net Income for Period.' The principal of the Trust shall be repaid when new income receipts are received"; (3) the allocation of $21,020.68 to principal is approved; (4) the allocation of $122,878.16 in interest to principal is approved; (5) the attorney and accountant fees are approved; and (6) the accounting is approved in all other respects.

## III. APPEAL

In her appeal, Carol raises one issue: in ruling on the petition, the trial court erred in allocating the $3 million Wave Crest distribution to principal because the court misinterpreted the governing statute, section 16350, and its findings are not supported by substantial evidence.[7]

The probate court has wide discretion to make any order and take any action necessary or proper to dispose of matters presented by a petition under section 17200. (§ 17206.) The applicable standard of review is therefore abuse of discretion. We are mindful, however, that "[t]he abuse of discretion

---

[7] The trial court's order is appealable pursuant to section 1304, subdivision (a), which provides, "With respect to a trust, the grant or denial of the following orders is appealable: [¶] . . . Any final order under Chapter 3 (commencing with Section 17200) of Part 5 of Division 9 . . . ." Section 1304 also provides exceptions for nonappealable orders that are not relevant here.

standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712 [76 Cal.Rptr.3d 250, 182 P.3d 579], fns. omitted.)

Because the threshold question on appeal is the interpretation of the pertinent provisions of section 16350, we will begin with an overview of those provisions.

### A. Section 16350

■ The statutory scheme for determining the allocation of money distributed to a trust is set forth in the Uniform Principal and Income Act (the Act) (§ 16320 et seq.). (*Estate of Thomas* (2004) 124 Cal.App.4th 711, 718 [21 Cal.Rptr.3d 741].) Effective January 1, 2000, the Act "was designed to update the law to take account of new estate planning practices and financial instruments, as well as to make principal and income rules consistent with the prudent investor rule embodied in the Uniform Prudent Investor Act [citations]." (124 Cal.App.4th at p. 718.)

Under the Act, the fiduciary's allocation of receipts to or between principal and income must be made in accordance with the provisions of the recipient trust. (§ 16335, subd. (a)(1).)[8] Where, as here, the trust provisions do not provide any guidance, the fiduciary is required to "administer a trust . . . in accordance with [the Act] if the trust . . . does not contain a different provision or does not give the fiduciary a discretionary power of administration." (§ 16335, subd. (a)(3).) Thus, as commentators have noted, "[o]ne function of the Act is to provide rules for identifying income and principal when there is no guidance in the governing instrument. These rules operate then as default rules which take effect in the absence of any direction in the instrument. [Citation.]" (3 Gold et al., Cal. Civil Practice: Probate and Trust Proceedings (2005) § 24:60, p. 24-72.)

Section 16350, which was enacted as part of the Act, "directs how a trustee should allocate money to a trust received from an entity . . . ." (*Estate of*

---

[8] The Probate Code defines "income" as "money or property that a fiduciary receives as current return from a principal asset. The term includes a portion of receipts from a sale, exchange, or liquidation of a principal asset, to the extent provided in Article 5.1 (commencing with Section 16350), 5.2 (commencing with Section 16355), or 5.3 (commencing with Section 16360)." (§ 16324.) No definition of "principal" is included in the Act because "it is not needed." (Cal. Law Revision Com. com., 54A West's Ann. Prob. Code (2010 supp.) foll. § 16324, p. 51.)

*Thomas, supra,* 124 Cal.App.4th at p. 718.) In pertinent part, section 16350 provides, "(b) Except as otherwise provided in this section, a trustee shall allocate to income money received from an entity. [¶] (c) A trustee shall allocate to principal the following receipts from an entity: [¶] . . . [¶] (3) Money received in total or partial liquidation of the entity. [¶] . . . [¶] [(d)](1) Money is received in partial liquidation (A) to the extent that the entity, at or near the time of a distribution, indicates that it is a distribution in partial liquidation, or (B) if the total amount of money and property received by all owners, collectively . . . is greater than 20 percent of the entity's gross assets . . . ."[9]

██ Thus, "[s]ummarized, section 16350 provides that a trustee must allocate receipts from an entity to income, unless those receipts meet one of the exceptions established in section 16350, subdivision (c). If an exception applies, the receipts must be allocated to principal." (*Estate of Thomas, supra,* 124 Cal.App.4th at p. 719.)

### B. *The Parties' Contentions*

Since it is undisputed that the $3 million Wave Crest distribution did not exceed 20 percent of its gross assets, the parties' dispute centers around the application of the partial liquidation exception, which mandates allocation to principal of money received from an entity where the distributing entity, "at or near the time of a distribution, indicates that it is a distribution in partial liquidation." (§ 16350, subd. (d)(1)(A).)

Carol contends that the trial court misinterpreted the partial liquidation exception by finding that the exception applied merely because Wave Crest had liquidated a major asset. According to Carol, the trial court's error resulted from ignoring the language of section 16350, subdivision (c)(3), which expressly requires that the money was received in partial liquidation of the entity, not an asset.

Additionally, while Carol does not dispute on appeal that the source of the $3 million Wave Crest distribution was the sale of the High Street property, she argues that the trial court erred by failing to require evidence of an "indication" by Wave Crest that the distribution was being made in partial liquidation of the entity. She points to the language of section 16350, subdivision (d)(1)(A), which provides that "[m]oney is received in partial liquidation . . . to the extent that the entity, at or near the time of a distribution, indicates that it is a distribution in partial liquidation . . . ."

---

[9] Additionally, section 16350, subdivision (d)(2) provides that "Money is not received in partial liquidation . . . to the extent that it does not exceed the amount of income tax that a trustee or beneficiary is required to pay on taxable income of the entity that distributes the money." This provision is not at issue in the present appeal.

Carol further asserts that the record here "is devoid of any facts supporting a finding that there was an indication by Wave Crest, at or around the date of distribution, that a partial liquidation of that entity had occurred or was occurring, much less that the High Street sale was part of such a liquidation of the entity." In Carol's view, the trial evidence showed to the contrary that Wave Crest labeled the distribution a " 'dividend,' which is income." She explains that the evidence regarding the $3 million Wave Crest distribution "strongly suggests the opposite of a liquidation—Wave Crest was implementing a plan for continued viability and financial success." Carol also maintains that her control of Wave Crest has no impact on the application of the partial liquidation exception.

Respondents disagree. They argue that the trial court properly found that the facts communicated to Carol at the time of the $3 million Wave Crest distribution were a sufficient indication by Wave Crest that the distribution was the result of a partial liquidation of the company. The facts referenced by respondents include, among others, Carol's inside knowledge of Wave Crest, a closely held corporation of which she was the president, chair of the board of directors, and trustee of the sole shareholder and, specifically, her knowledge of Wave Crest's strategy to improve its future cashflow by selling High Street; Michael Blas's flowchart presentation to the Wave Crest board that characterized the High Street proceeds as a "return of capital"; and Blas's testimony that the Wave Crest board had decided to sell High Street because it would "generate cash into the corporation."

## C. *Analysis*

Our analysis of the parties' contentions begins with the interpretation of the partial liquidation exception set forth in section 16350, subdivisions (c)(3) and (d)(1)(A). As we have noted, those provisions state that "(c) A trustee shall allocate to principal the following receipts from an entity: [¶] . . . [¶] (3) Money received in total or partial liquidation of the entity. [¶] . . . [¶] (1) Money is received in partial liquidation (A) to the extent that the entity, at or near the time of a distribution, indicates that it is a distribution in partial liquidation . . . ." (§ 16350, subds. (c)(3), (d)(1)(A).)

■ There are few appellate decisions concerning the partial liquidation exception or the determination of whether an entity has indicated that its distribution to a trust is a distribution in partial liquidation within the meaning of section 16350, subdivision (d)(1)(A). In *Hasso v. Hasso* (2007) 148 Cal.App.4th 329 [55 Cal.Rptr.3d 667] (*Hasso*), the issue was whether cash distributed to a trust by a corporation, of which the trust was a shareholder, should be allocated to income or principal. In ruling that the allocation to income was proper, the *Hasso* court stated, "We need not decide

precisely what language the distributing entity must use to 'indicate' that a partial liquidation is taking place, but we do decide that a simple advisement that an asset has been converted into cash for distribution does not a fortiori give the notice envisioned by section 16350, subdivision (d)(1)(A)." (*Id.* at p. 341.)

We apply the well-established de novo standard of review in construing the partial liquidation exception of section 16350, subdivision (d)(1)(A). "In statutory construction cases, our fundamental task is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.]" (*Estate of Griswold* (2001) 25 Cal.4th 904, 910–911 [108 Cal.Rptr.2d 165, 24 P.3d 1191].) " 'We begin by examining the statutory language, giving the words their usual and ordinary meaning.' [Citations.]" (*Id.* at p. 911.) "If the terms of the statute are unambiguous, we presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citations.]" (*Ibid.*) "If there is ambiguity, however, we may then look to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.]" (*Ibid.*) "In such cases, we ' " 'select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' " ' [Citation.]" (*Ibid.*)

Applying this standard, we turn to the usual and ordinary meaning of the word "indicate" in the partial liquidation exception, which provides that "[m]oney is received in partial liquidation . . . to the extent that the entity, at or near the time of a distribution, indicates that it is a distribution in partial liquidation . . . ." (§ 16350, subd. (d)(1)(A).) The word "indicate" has a dictionary definition of "[t]o point out, point to, make known, show (more or less distinctly)." (Oxford English Dict. Online (2d ed. 1989) <http://www.oed.com> [as of Sept. 3, 2010]; see *Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121–1122 [29 Cal.Rptr.3d 262, 112 P.3d 647] [courts appropriately refer to the dictionary definition to determine the ordinary meaning of a word in a statute].)

The word "liquidation" is defined as "[t]he process of selling assets, such as inventories or securities, in order to achieve a better cash position. The term also refers to the termination of a business by converting its assets to cash, paying its liabilities, and distributing the residue among the partners or stockholders." (McGraw-Hill Dict. of Modern Economics (3d ed. 1983) p. 273.) Additionally, the California Supreme Court has stated, " 'Liquidation of a corporation is defined as "the operation of winding up its affairs by

realizing its assets,[10] paying its debts and appropriating the amount of profit or loss." [Citation.]' " (*Estate of Traung* (1947) 30 Cal.2d 811, 814 [185 P.2d 801].)

 Based on the usual and ordinary meanings of the words "indicate" and "liquidation," we determine that the *partial* liquidation exception of section 16350, subdivision (d)(1)(A) applies where the entity has made known in some manner that the distribution to a trust was the result of the entity selling an asset or assets in order to achieve a better cash position, and not to terminate the business. Since the statute does not specify the manner in which the entity must indicate or make known that the distribution was in partial liquidation of the entity, we believe that the trial court must determine on a case-by-case basis whether the entity's indication was sufficient to trigger the partial liquidation exception of section 16350, subdivision (d)(1)(A). On review, the appellate court must determine whether substantial evidence supports the trial court's factual finding that the entity indicated at or near the time of a distribution to the trust that the entity was making the distribution in partial liquidation, in order to determine whether the trial court abused its discretion in allocating the distribution.

The Law Revision Commission comment regarding the partial liquidation exception set forth in section 16350, subdivision (d)(1)(A) supports our interpretation. The commission's official comment states in pertinent part: "Under [subdivision (d)(1)(A)], any distribution *designated* by the entity as a partial liquidating distribution is principal regardless of the percentage of total assets that it represents." (Cal. Law Revision Com. com., 54A West's Ann. Prob. Code, *supra*, foll. § 16350, p. 75, italics added.) Although the commission's official comments are not binding, they "reflect the intent of the Legislature in enacting" a statute and "are entitled to substantial weight in construing it. [Citations.]" (*HLC Properties, Ltd. v. Superior Court* (2005) 35 Cal.4th 54, 62 [24 Cal.Rptr.3d 199, 105 P.3d 560].)

The *Hasso* court stated that the Law Revision Commission comment regarding section 16350, subdivision (d)(1)(A) "implies at least *some* degree of specificity is necessary to advise the shareholders the entity is being partially liquidated." (*Hasso, supra*, 148 Cal.App.4th at p. 340.) To the extent that the *Hasso* court's statement may be read as interpreting section 16350, subdivision (d)(1)(A) to require the entity to make known in some manner that a distribution to a trust is a distribution in partial liquidation of the entity, we agree. However, we believe that the commission's comment does not require any greater degree of specificity, since the word "designate" and the word "indicate" (the actual word used in § 16350, subd. (d)(1)(A)) are

---

[10] A "realized asset" has been "convert[ed] into actual money." (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 970.)

essentially interchangeable. A dictionary definition of "designate" is "to indicate and set apart for a specific purpose, office, or duty . . . ." (Merriam-Webster's Collegiate Dict., *supra*, at p. 312.) We disagree, therefore, with any suggestion that the Law Revision Commission Comment to section 16350, subdivision (d)(1)(A) requires the entity to expressly state that a distribution to a trust is a "distribution in partial liquidation" before the partial liquidation exception may apply.

For these reasons, we determine under the de novo standard of review that the partial liquidation exception provided by section 16350, subdivision (d)(1)(A) applies where the entity has made known in some manner that a distribution to a trust was the result of the entity selling an asset or assets in order to achieve a better cash position. Having made that determination, we turn to the question of whether substantial evidence supports the trial court's implied finding that Wave Crest indicated at or around the time of the distribution that the $3 million distribution was a distribution in partial liquidation.

"In general, in reviewing a judgment based upon a statement of decision following a bench trial, 'any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision. [Citations.]' [Citation.] In a substantial evidence challenge to a judgment, the appellate court will 'consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]' [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment. [Citation.]" (*Estate of Young* (2008) 160 Cal.App.4th 62, 75–76 [72 Cal.Rptr.3d 520].) The appellant has the burden of demonstrating that "there is no substantial evidence to support the challenged findings." (*Nichols v. Mitchell* (1948) 32 Cal.2d 598, 600 [197 P.2d 550].)

Having reviewed the record in its entirety, we determine that substantial evidence supports the trial court's implied finding that Wave Crest timely indicated, within the meaning of section 16350, subdivision (d)(1)(A), that the $3 million distribution to the Trust was a distribution in partial liquidation of the entity. When the trial evidence is viewed in the light most favorable to respondents, it is apparent that Wave Crest made it known that the $3 million distribution to the Trust was the result of Wave Crest selling the High Street property in order to achieve a better cash position.

Most significant are the minutes of the Wave Crest board meeting held on February 28, 2007, and continued to March 1, 2007, where the $3 million

distribution issued on March 1, 2007, was discussed. The minutes state in their entirety, "The Board discussed the proceeds from the sale of High Street. After a presentation and outline made by Michael Blas with further explanation by Damon Shanle regarding having the corporation make a dividend to the Trust, the Board was advised by the Trustee, Carol Manson that upon having available cash, the Trust would immediately repay the existing indebtedness to Wave Crest which was approximately $978,000 would be repaid [*sic*]. After Board discussion with Carol Manson abstaining, there was a motion and unanimous vote by remaining Board Members to make a $3,000,000 dividend to be made by Wave Crest to the Trust."

In these minutes, the Wave Crest board made known its intention to use the cash proceeds of the High Street sale to, in part, provide cash to the Trust so that the Trust would in turn pay its debt to Wave Crest. This intention was consistent with the strategic plan for Wave Crest that its adviser, Michael Blas, was asked to create. He explained that "the strategy was to generate additional cash flow for Wave Crest. Just [selling] High Street and [400 Encinal] was going to improve negative cash flow by $60,000 a month . . . . Wavecrest was caught within a very negative cash flow position, and so initially it was only to try to improve the cash position of Wave Crest." Additionally, Blas testified regarding the board's strategy regarding High Street: "it was determined that High Street . . . we could sell it outright, generate cash into the corporation, get rid of $20,000 of negative cash flow, and improve the financial position of Wavecrest . . . . So in essence we had received a significant amount of cash without [*sic*] very little tax effect to it."

Blas further explained in his testimony that the $3 million distribution of High Street sale proceeds was declared as "a part of a transaction in a long series of a strategic plan to improve the cash flow to improve the position of not only Wavecrest, [but also] the shareholder and the entire group entity." He stated that "[i]f Wavecrest had not gotten assurances that the trustee would pay back [the Trust's] liability, that dividend would not have been $3 million because Wavecrest needed at least a million dollars reserved on their books."

From the context of the Wave Crest board minutes, as explained by the board's adviser, Michael Blas, we reasonably infer that Wave Crest made it known, or indicated, at the time of the board meeting held on February 28, 2007, and continued to March 1, 2007, where the $3 million distribution was discussed, that the March 1, 2007 distribution to the Trust of $3 million in cash was the result of Wave Crest selling High Street in order to achieve a better cash position. By providing the Trust with cash from which the Trust would repay its $978,000 debt to Wave Crest, Wave Crest would be able to create a $1 million reserve and eliminate High Street's negative cashflow.

■ Based on our reasonable inference, we determine that substantial evidence supports the trial court's implied finding that Wave Crest indicated at or around the time of the distribution that the $3 million distribution to the Trust was a distribution in partial liquidation of the entity. Consequently, we conclude that the partial liquidation exception of section 16350, subdivision (d)(1)(A) applies and the trial court properly allocated the $3 million distribution to Trust principal.

Having reached this conclusion, we need not address Carol's alternative argument that the allocation to principal was not proper under section 16350, subdivision (e).

## IV. CROSS-APPEAL*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## V. DISPOSITION

The trial court's order of February 9, 2009, is affirmed. The parties shall bear their own costs on appeal and cross-appeal.

Mihara, J., and Duffy, J., concurred.

---

*See footnote, *ante*, page 1244.