Filed 3/23/23  Messick v. Carlos CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| OLIVIA MESSICK, as Trustee, etc., Plaintiff and Respondent, v. DANIEL CARLOS Defendant and Appellant. | D080115 (Super. Ct. No. 37-2021-00048628-PR-TR-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Julia C. Kelety, Judge.  Affirmed.

Aniela K. Szymanski for Defendant and Appellant.

Hughes & Pizzuto and Laurie E. Barber for Plaintiff and Respondent.

## INTRODUCTION

Olivia Messick and her brother Daniel Carlos are beneficiaries of their deceased mother Eugenia S. Carlos's trust, along with their siblings and other relatives.  The trust's primary asset was Eugenia's house.  Olivia, as trustee, filed a petition for approval to sell the house, in order to distribute the trust assets and pay administrative expenses and taxes.  Over Daniel's

objection, the probate court entered an order approving the sale. Daniel appeals from the order, contending the court lacked evidence for its decision. We disagree, and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Eugenia created the Carlos Family Trust (the Trust) in December 2005. She named Olivia, another daughter, Gloria Carlos, and her brother Vincent Jose Soriano as trustees. The Trust's primary asset was Eugenia's house in El Centro, California (the Property).

Multiple sections of the Trust are relevant to this appeal. Section 3.2 states the trustee "shall with respect to any and all property . . . have power, exercisable in the [t]rustee's discretion" to, among other things, "[s]ell . . . repair, manage, operate and control" trust property. Under Section 2.6, the trustee is required to make certain distributions after Eugenia's death. Three grandchildren each receive a $2000 cash bequest. The trustee then "divide[s] the remaining corpus into thirteen (13) equal shares" to recipients including Daniel, Olivia, and their sister Leticia, Eugenia's youngest child. Distribution is addressed in Section 4.9:

> "On any final or partial distribution of the assets of the Trust Estate and on any division of the assets of the Trust Estate into shares or partial shares, the Trustee may distribute or divide such assets in kind, may distribute or divide undivided interests in such assets, *or may sell all or any part of such assets* and make distribution or division in cash, in kind, or partly in cash and partly in kind. The decision of the Trustee, either prior to or on any division or distribution of such assets, as to what constitutes a proper division of such assets of the Trust Estate shall be binding on all persons in any manner interested in any trust provided for in this Declaration." (Italics added.)

According to a probate court filing by Daniel, Eugenia entered a skilled nursing facility in 2008, and a third party initially rented the Property. In 2018, Leticia began renting the Property. In September 2020, Eugenia died.

2

Vincent and Gloria resigned as trustees, leaving Olivia as the sole trustee (Trustee).

In January 2021, Olivia and a sibling began a text message exchange about the Property. Olivia told the sibling she would try to sell the Property "as is" with "[n]o improvements." When Olivia said she planned to use "an estate attorney to handle the sale and distribution," the sibling told her, "That sounds expensive. [¶] Why not do it ourselves?" Olivia responded, "Probably is but I don't want to deal with all the discord and bickering from family members."

A few months later, an attorney sent a letter to the beneficiaries, stating she represented Olivia as Trustee. The attorney said the Trustee "wants to know if any beneficiary wants to purchase the property from the Trust," and noted that "selling the residence to a beneficiary can potentially save the Trust on sale and escrow expenses[.]"

In May 2021, Daniel submitted an offer of $200,000, with a contingency of full financing. The offer had another contingency set forth in an addendum stating, "the Property may be subject to (i) a right of first offer and (ii) a right of first refusal, in favor of Tenant or other Interested parties[.]" The addendum further stated that if such rights were exercised, the agreement "shall assign to [T]enant or terminate without approval from [S]eller, at Tenant[']s sole discretion, the Deposit shall be returned to Buyer, and Seller shall reimburse Buyer for its actual, out-of-pocket expenses relating to its investigation of the Property, not to exceed $5,000.00."

Later that month, the Trustee sent the beneficiaries a notice of proposed action to sell the Property for a price between $189,000 and $210,000. The Property was then listed for sale at $210,000. The Zillow listing identified a broker and stated, "This home is in need of some repairs

3

and will need to be a CASH ONLY, due to current condition, this home will not pass a VA or FHA inspection. Property is being sold 'AS IS' by a Trust[.]"[1]

Daniel demanded an accounting from the Trustee, citing purported irregularities in the sale process, and the Trustee's counsel responded. In a letter to Daniel, counsel stated that the beneficiaries would receive an annual accounting in September 2021, and noted the Trust assets consisted of the Property and a bank account. She then stated the Trustee rejected Daniel's offer, because it was "less than the amount that could be obtained on the open market" and had "several contingencies that were not acceptable." She explained that using a "competent broker will ensure the Property will be sold for the maximum value," they were receiving offers, and they were "willing to work with [Daniel]" to see if he could match the offers received. Counsel closed her letter to Daniel by stating: "The Trustee has no problem selling the Property to you, provided you are able to match the best offer received."

Several beneficiaries later signed a "Gift of Equity Letter" (some capitalization omitted), which offered Leticia equity "equivalent to the net proceeds" of that person's share, not exceeding $15,000, and said the gift would be "transferred in conjunction with the closing" of the sale.

In July 2021, the Trustee's counsel sent the beneficiaries an update. She advised them the Trustee rejected Daniel's offer because of its contingencies. She then stated the Trustee received four written offers (for $180,000, $200,000, $212,000, and $215,000), and listed the estimated net

---

[1]     We infer "VA" and "FHA" refer to the Veterans Administration and Federal Housing Administration. (See *Ridgeway v. Industrial Acc. Com.* (1955) 130 Cal.App.2d 841, 845.)

proceeds of each offer. She attached a "Summary Comparing Multiple Offers," with information on costs, proposed closing dates, and payment type. Counsel also acknowledged the beneficiaries' gifts, noted the Trustee understood Daniel wanted to buy the Property so Leticia could stay there, and said Daniel "just needs to match" the highest offer.

In early September 2021, the Trustee received an all-cash $210,000 offer, with no contingencies, from Guadalupe Feltner.

On September 22, 2021, the Trustee sent a notice of proposed action to sell the Property for $210,000. In describing the "Reason for Proposed Action," the notice stated: "In order to pay trust administrative expenses and costs, including . . . income taxes, and close the Trust administration, the sale of the real property is needed."

Daniel submitted an objection, and the Trustee's counsel notified the beneficiaries that the Trustee would have to file an approval petition. She stated Daniel would have to present a comparable offer that was higher than the proposed offer. She also noted Leticia had submitted an offer for $215,000, but it was rejected because it was "less than the required overbid amount . . . and . . . contingent on [her] and the property qualifying for an FHA loan."

In November 2021, the Trustee filed the operative petition to approve sale of real property (the Petition), with a copy of the Trust and the Feltner offer.[2] As Trustee, Olivia sought approval of the sale to Feltner, in accordance with the September 22 notice of proposed action. In February

---

[2] Although the Trustee listed Probate Code section 16503, subdivision (c), on the Petition, the probate court's register of actions identifies it as "Petition Re Internal Affairs of Trust (Probate Code 17200)." All further undesignated statutory references are to the Probate Code.

2022, the Trustee filed a declaration stating Feltner withdrew from escrow, but she secured a $214,000 offer from Shirley E. Harrington, also all-cash and with contingencies waived. She provided a copy of the offer, and now asked the court to approve a sale to Harrington.

Daniel filed an objection to the Petition. Pertinent here, he argued the proposed sale would "net less" than a sale to a beneficiary; there had not been a "proper appraisal"; the Trustee "failed to maintain and repair the property" so as to maximize its sale price; and the Trust permitted in-kind distributions instead. He also argued that if the probate court did not order a sale to a beneficiary, it should order the Trustee to make the necessary repairs. His supporting documents included his May 2021 offer; the November 2021 letter from Trustee's counsel reflecting Leticia's offer, and other counsel letters; the text messages with Olivia; and the Zillow listing.

The probate court held a hearing on the Petition in March 2022, and granted it with modifications. The court's order indicated it "read and considered the objections, and read all arguments of counsel."[3] The court first approved the September 22, 2021 notice of proposed action to sell the Property. The court then stated the Trustee was "approved to sell the [Property] for a price not less than $214,000, all cash with no contingencies,"

---

[3] Daniel asserts the probate court did not "allow[ ] any argument or testimony at the hearing[.]" We disregard this assertion, because there is no reporter's transcript of the hearing, nor an adequate substitute such as a settled statement. (See *Fierro v. Landry's Restaurant Inc.* (2019) 32 Cal.App.5th 276, 281, fn. 5 (*Fierro*).)

for offers submitted within three days of the order.  The court also approved broker commissions.[4]

## DISCUSSION

Daniel contends we should reverse, because there is no substantial evidence to support the probate court's order approving the sale.  We conclude the record supports the court's factual findings, and we will affirm its order.

## I.

### *Relevant Legal Principles*

Under the trust administration provisions of the Probate Code, a trustee "may give a notice of proposed action" regarding certain matters. (§ 16500, citing § 16200 et seq. and § 16320 et seq.)  These matters include actions pursuant to "powers conferred by the trust instrument."  (§ 16200, subd. (a).)

A "beneficiary may object to the proposed action by delivering a written objection . . . to the trustee . . . within the time period specified in the notice of proposed action."  (§ 16503, subd. (a).)  If the trustee receives such an objection, the "trustee . . . may petition the court to have the proposed action taken as proposed, taken with modifications, or denied."  (§ 16503, subd. (c).) "In the proceeding, a beneficiary objecting to the proposed action has the burden of proving that the trustee's proposed action should not be taken." (*Ibid.*)

---

4      The Trustee discusses offers received after the appealed-from order. We do not consider them.  (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379 fn. 2 [normally, " 'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered' "].)

A trustee also "may petition the court . . . concerning the internal affairs of the trust" under section 17200, including "passing upon the acts of the trustee, including the exercise of discretionary powers." (§ 17200, subds. (a), (b)(5).) Such powers may include the sale of real property. (*Siegel v. Fife* (2015) 234 Cal.App.4th 988, 990, 995 (*Siegel*) [affirming order confirming sale of real property in trust, pursuant to § 17200, subd. (b)(5)].)

## II.

### *Standard of Review*

We review the probate court's factual findings for substantial evidence. (Cf. *Manson v. Shepherd* (2010) 188 Cal.App.4th 1244, 1258–1259, 1266 (*Manson*) [affirming orders regarding § 17200 petition; applying abuse of discretion review, and stating " 'findings of fact are reviewed for substantial evidence' "].)

Substantial evidence review " 'begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, to support the findings below.' " (*Orange Catholic Foundation v. Arvizu* (2018) 28 Cal.App.5th 283, 292.) " '[W]e view the record in the light most favorable to respondent[ ], giving them the benefit of every reasonable inference and resolving all conflicts in their favor.' " (*Ibid*.) A party challenging a trial court's factual determinations thus bears an " ' "enormous burden" ' " on appeal. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.)

This burden is even weightier where, as here, "the trier of fact has expressly or implicitly concluded that the party with the burden of proof failed to carry that burden[.]" (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 279.) In such a case, "the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of

such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*Ibid.*, quoting *Roesch v. De Mota* (1944) 24 Cal.2d 563, 571.) In other words, the appellant must demonstrate the evidence *compels* a finding in his favor as a matter of law. (See *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465–466 (*Sonic Mfg. Technologies*).)[5]

"In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record." (*WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894.) "Rather than scour the record unguided, we may decide that the appellant has forfeited a point urged on appeal when it is not supported by accurate citations to the record. [Citations.] Similarly, we may disregard conclusory arguments that are not supported by pertinent legal authority." (*Ibid.*; see Cal. Rules of Court, rule 8.204(a)(1)(C) ["any reference to a matter in the record [must be supported] by a citation to the volume and page number of the record"].) Daniel's statement of facts contains citations that do not always support the stated facts, and his arguments are largely devoid of record citations. We shall disregard factual assertions that are not accompanied by accurate record references. (See *Fierro, supra,* 32 Cal.App.5th at p. 281, fn. 5 ["appellate

---

5       Daniel asserts we review the probate court's *decision* for substantial evidence, that is, not just factual findings. But neither he, nor the Trustee, identifies authority on the standard of review for section 16503 petitions. We arguably could review the decision for abuse of discretion—the standard for section 17200, under which property sales also may be approved and how the Petition was identified in the register of actions. (*Manson, supra*, 188 Cal.App.4th at p. 1258–1259; *Siegel, supra*, 234 Cal.App.4th at pp. 990, 995.) But because Daniel focuses on the record (and we effectively review for substantial evidence, either way), the distinction is inconsequential here.

courts may ' "disregard any factual contention not supported by a proper citation to the record" ' "].)

III.

*The Probate Court Did Not Err in Approving the Sale*

The gravamen of Daniel's appeal is that substantial evidence does not support the probate court's approval of the Property sale, because, in substance, the Trustee failed to maximize the sale price and could have distributed the Trust assets in kind. His position lacks merit.

The probate court impliedly found the Trustee's proposed action (as modified in its order)—to sell the Property for at least $214,000, in an all-cash, no-contingency transaction—was within her power and discretion under the Trust, and that Daniel did not meet his burden to show the action should not be taken. (See §§ 16500, 16200, subd. (a) [trustee may give notice of proposed action, including for actions pursuant to "powers conferred by the trust"], 16503, subd. (c) [in court proceeding on petition to approve proposed action, objecting beneficiary has burden of proof].)

Substantial evidence supports these findings. Section 3.2 of the Trust gave the Trustee "power, exercisable in [her] discretion" to "[s]ell" Trust property. Section 4.9 gave her authority to "sell all or any part of [the Trust] assets and make distribution or division in cash, in kind, or partly in cash and partly in kind," and made this decision "binding" on anyone interested in the Trust. The record reflects the proposed sale was within the bounds of this power and discretion. Under the circumstances (the Property being the Trust's main asset, numerous beneficiaries, and the need to pay expenses and taxes), the Trustee could reasonably decide to sell the Property, rather than distribute assets in kind. She used a broker to maximize value and received multiple offers (from $180,000 to $215,000), showing the Property was in

10

marketable condition and competitively priced. And she could conclude the Harrington offer, for which she sought approval, was the best: at $214,000, it was near the high end of the offers, and it involved an all-cash, no contingency sale, so closing could occur expeditiously. Although Daniel provided evidence that he and Leticia each made an offer, their offers had contingencies the Trustee could find unacceptable (including, for Daniel, a right of first refusal for the tenant and possible investigative costs of $5,000; and, for Leticia, the need to qualify for an FHA loan).

Daniel's arguments do not compel a different result.

First, Daniel takes issue with the payment terms. He argues the Trustee "did not . . . obtain an appraisal," so the probate court lacked "adequate evidence" to determine if the price was reasonable. We disagree. The record reflects the Trustee received multiple offers with similar prices, and, again, the approved sale price of $214,000 was at the high end of this range. Daniel provides no legal authority that the only evidence of appropriate price in this context is an appraisal.

He then contends the probate court's "addition of the 'all cash' term was arbitrary." He states the term is not in the Trust, and the court has " 'no power to alter' " its terms, citing *Estate of Bodger* (1955) 130 Cal.App.2d 416. The court did not alter the Trust. Rather, Sections 3.2 and 4.9 of the Trust give the Trustee authority and discretion over property sales; the Trustee sought approval of an all-cash sale; and the court granted it. *Bodger* is accordingly inapposite. (*Id.* at pp. 417–418 [probate court erroneously altered trustee compensation, in conflict with trust term expressly setting compensation].)

Daniel also contends there was no evidence an all-cash sale would be more beneficial, speculating that "selling the property for 50% more, but

11

waiting 30 days for the sale to close would be of much greater net benefit[.]" He further contends a hasty sale "only benefited" Olivia as Trustee, citing the text message exchange to assert she "stated . . . she just wanted to sell the property so her burden of administrating the estate would end." We are not persuaded. Daniel's speculation about the benefits of delay is not evidence and, as noted above, the Trustee could reasonably conclude an expeditious sale was beneficial to all beneficiaries. It could reduce the chances of escrow complications, and, more broadly, limit carrying costs and take advantage of a competitive market. As for the Trustee's purported statement about her motives, the cited text message conversation started in January 2021, months before the sale process commenced, and reflects no such statement, regardless. Thus, we need not address Daniel's cases regarding trustee conflicts of interest.

Second, Daniel argues he "set forth to the [probate] court numerous purchase offers from himself and Leticia"; that these offers "would have resulted in . . . more net proceeds because sales costs would have been much lower than if sold to a third party" (italics omitted); and the Trustee "admitted . . . the [proposed] sale would cost all the beneficiaries more in expenses." He further argues the Trustee "merely equated 'best offer' to the offer with the highest purchase price without looking at the per beneficiary net proceeds." Daniel cites no evidence here that there were "numerous" offers from him and Leticia with "much lower" costs (much less any admission by the Trustee), and the offers they did make had contingencies that were unacceptable to the Trustee. Further, the record does not reflect the Trustee ignored net proceeds. Indeed, the July 2021 letter from her counsel lists the estimated net proceeds for the four offers received by that point, with an attachment containing additional information on costs.

Third, Daniel contends the Trustee "allowed the [P]roperty to waste away, to the point that it could not even pass an inspection," hence his request that the probate court require her to make "needed repairs, so that the highest possible sales price could be realized." This argument lacks merit, too. The September 22 notice of proposed action indicated the sale was necessary in part to pay administrative expenses and taxes. Daniel does not identify evidence establishing what repairs were needed, or that the Trust had sufficient funds to pay for them.[6] Further, Section 3.2 gave the Trustee discretion over Property repairs. The court could impliedly find she properly exercised this discretion, in conjunction with the sale process. Specifically, she could reasonably determine the cost of repairs prior to sale would not sufficiently increase the Property's value or marketability, so as to justify them. That determination was borne out during the sales process. Although the Property's Zillow listing did state it would not pass a VA or FHA inspection, there were still multiple offers.

Daniel's reliance on *Martin v. Bank of America National Trust & Savings Association* (1935) 4 Cal.App.2d 431 is misplaced. *Martin* involved a trustee action *not* permitted by the trust, and is thus distinguishable. (*Id.* at pp. 435, 437 [affirming judgment against trustee bank that relinquished trust property in manner that purportedly was more advantageous to plaintiff, where "nothing in the trust agreement" permitted such action].)

---

6    In his statement of facts, Daniel says Trust assets included "bank accounts, insurance policies, and rental income," but his cited record pages address only rent, not bank accounts or insurance policies. The record elsewhere reflects some rental income was used for funeral expenses, and there was a single bank account of unidentified size.

13

Finally, Daniel argues there "was nothing before the [probate] court supporting a finding that a sale of [the Property] was the only way . . . to distribute" the Trust assets. The court did not find a sale was the only way to distribute the assets. Rather, the court approved the Trustee's proposed sale of the Property, which would allow for cash distribution. As discussed above, this decision was within the Trustee's power and discretion and was reasonable under the circumstances.

*Trolan v. Trolan* (2019) 31 Cal.App.5th 939 (*Trolan*), cited by Daniel here, actually supports the probate court's order. *Trolan* involved six sibling beneficiaries and co-trustees over the age of 30, and a trust that required distribution once they all reached age 30. (*Id.* at pp. 942–944.) One sibling asked for her share, the other five sought to maintain the real property in the trust and utilize other assets to resolve her share, and the probate court ordered liquidation and distribution. (*Id.* at pp. 944–947.) The Court of Appeal reversed, explaining that although the trust required distribution, it "grant[ed] the trustees discretion regarding the method of distribution" and they could do so "without liquidating the trust assets." (*Id.* at pp. 955–956). Here, in contrast, the probate court approved the *Trustee's* decision to sell the Property and distribute the Trust assets in cash.[7]

---

[7] Daniel concludes by arguing the probate court's approval prejudiced the beneficiaries, reiterating his view that they would "receive less net proceeds" than under alternative options, and asserting, without citation, that in-kind distributions would avoid additional expenses. " 'To establish prejudice, a party must show "a reasonable probability that in the absence of the error, a result more favorable to [it] would have been reached." ' " (*Trolan, supra*, 31 Cal.App.5th at p. 950.) Even if the probate court erred (and it did not), Daniel has not established that denial of the sale would have produced a better result for the beneficiaries, based on net proceeds or otherwise.

In sum, Daniel has failed to demonstrate the evidence compels a finding in his favor as a matter of law.  (*Sonic Mfg. Technologies, supra*, 196 Cal.App.4th at pp. 465–466.)  We conclude the probate court did not err in approving the sale of the Property.

DISPOSITION

The order is affirmed.  Respondent Trustee is entitled to her costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

DO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

DATO, J.

15