Filed 8/1/13  DuRoss v. Bank of the West CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| DANIEL V. DuROSS, Special Trustee,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>BANK OF THE WEST et al.,<br><br>Defendants and Respondents. | B240011<br><br>(Los Angeles County<br> Super. Ct. No. YP009645) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dudley W. Gray II, Judge.  Affirmed.

Daniel V. DuRoss, in pro. per., for Plaintiff and Appellant.

Phillips Law Partners, Tim H. Lan and Gary R. Phillips for Respondent Bank of the West.

Daniel V. DuRoss is special trustee for the John H. Stewart Trust (Trust), which Stewart created to care for his son, Ronald Stewart (Ron), a developmentally disabled adult. Ron lives with and is cared for by his conservator Michelle Malveaux and her husband Paul Malveaux.[1] DuRoss filed a petition under Probate Code section 17200,[2] seeking authorization to pay $270,000 for improvements to the Malveauxs' home to improve care for Ron. That petition was granted. However, when additional costs arose, he filed a second petition seeking authorization to pay $321,425, an increase of $51,425. The trial court granted the petition in part and denied it in part, authorizing the disbursement of only an additional $17,500 and ordering that the sum be paid by deducting $1,000 a month from the monthly conservator fee paid to Michelle Malveaux. DuRoss appeals, contending that the trial court erred in restricting his discretion to make the disbursement. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Stewart created the Trust on October 21, 1992, and amended it in 2004 and 2007. The primary purpose of the trust was to provide financial aid for Ron to supplement any government benefits that were available to him. The trust provided that any funds remaining in the trust following Ron's death were to be distributed to certain specified beneficiaries.

In 2007, Ron was in his late 40's. He weighed about 400 pounds and had a mental age of about 7 years. Stewart hoped that upon his death or disability, his neighbors would care for Ron. But when Stewart was admitted to the hospital that

---

[1]    We refer to John H. Stewart as Stewart and his son as Ron, as the parties do. The Malveauxs are referred to by first name when needed to distinguish between them.

[2]    All further statutory references are to the Probate Code unless otherwise specified.

year, the Malveauxs stepped in to care for Ron when the neighbors failed to do so. Thereafter, about 5 months before Stewart's death, the Malveauxs became caretakers for both Stewart and Ron. Stewart amended the trust (the second amendment) and nominated Michelle and Paul to act as conservators. After Stewart's death, Michelle was appointed by the court to be Ron's conservator, and the Malveauxs cared for Ron in their home in Compton.

The second amendment to the trust provided that, "within one year of [Stewart's] death the trustee may in the trustee's discretion pay to the person or persons with whom [Ron] is living, or pay directly such costs of additions or improvements, sufficient funds to improve that person's home to make it convenient for [Ron] to live therein. Such costs of improvements shall include not only improvements and additions such as bedrooms and bathrooms to be used by the beneficiary, but also such other common areas of the home that would make it more comfortable or convenient to care for and house [Ron]. The cost thereof shall not exceed twenty-five (25) percent of the fair market value of the trust estate at [Stewart's] date of death."

After Stewart's death, two of the remainder beneficiaries, Robert and Kathleen Thornton, filed a petition to set aside the second amendment to the trust. The dispute was resolved in October 2008 through a settlement agreement under which DuRoss was appointed special trustee and Bank of the West was appointed successor trustee. The settlement agreement also addressed improvements to the Malveauxs' home, providing as follows: "Funds will be allocated forthwith by the Trust to remodel the Malveauxs' home as provided in the Second Amendment, but with a 2-year recapture provision from their ultimate share of the trust estate in the event Ron sooner died, and a 4-year recapture period if Ronald ceases living with them for any reason other than his death. In other words, if the remodel cost

3

$70,000, and Ron moved out 2 years after the date of this Settlement Agreement, the Malveauxs would have $35,000 deducted from their ultimate distribution from the Trust after Ron's death."

On February 25, 2009, Bank of the West sent a notice to beneficiaries and interested parties stating in part that the trustee intended to make disbursements for the construction of additions and improvements to the home where Ron was living. The notice stated that the amount to be disbursed was not known but would not exceed $325,000.

Kathleen Thornton objected to the amount of the proposed disbursement, stating that Stewart intended to provide only $70,000 to improve the Malveauxs' home to accommodate Ron. She further argued that the amount was unreasonable because the Malveauxs' home was valued at $229,000.

In September 2010, DuRoss petitioned the court to authorize payment for the improvement of the home. He stated that he had obtained plans for the remodel and approval for the plans from the City of Compton. DuRoss had chosen a contractor after obtaining bids from three contractors whose bids were within 10 percent of each other. The bid DuRoss chose was $295,450, although it was likely the cost would be higher than that because of the age of the home.

DuRoss explained that the improvements were for Ron's benefit and included a bedroom and attached bathroom designed specifically for him, another bathroom designed specifically for him, a family room primarily for Ron's use and the remodeling of an existing bathroom to better suit his needs. The plans also included improvements to common areas that would benefit Ron and make it easier for the Malveauxs to care for him.

DuRoss further stated that the trust allowed up to 25 percent of the value of the estate at Stewart's death to be used for improvements to the home where Ron

4

lived. The estate was valued at $1,513,308.80 when Stewart died, but the Stewart residence was sold at a loss of $105,000, resulting in a value of $1,408,308.80. DuRoss accordingly asked the court to approve a maximum budget of $352,077.20 for the improvements to the Malveauxs' home. DuRoss pointed out that the $70,000 figure cited in the settlement agreement was only used as an example of how the recapture provision worked.

In seeking court approval, DuRoss stated that the Malveauxs had done a good job caring for Ron, helping him lose weight from 395 pounds to 225 pounds, and accepting him as a member of the family. DuRoss further stated that, although Ron was 53 years old, his mental age was that of a 7-year-old. Ron frequently asked Michelle when he would get his own room and when he would be able to have his toys and other belongings that were in storage because the Malveauxs' home was too small.

James C. Shields, the Probate Volunteer Panel (PVP) attorney appointed by the court to represent Ron, objected on the basis that the proposed improvements to the home were excessive and not in Ron's best interest. (See Super. Ct. L.A. County, Local Rules, rules 4.123 to 4.127.) Shields expressed the opinion that the proposed improvements would "unnecessarily deplete the corpus of the special needs trust, placing Ron's continued care at risk." He further opined that, if the entire $352,077.20 were distributed, the trust would be exhausted in approximately 10 years, but if it were not, the trust would be exhausted in approximately 19 years. Shields further stated that it was likely Ron would live more than 10 years.

At a December 2010 hearing, the Honorable Michael Vicencia presiding, the court approved the petition. The court found that the value of the trust was $1,513,308.80 at Stewart's death and $1,408,308.80 following the sale of the residence in the trust. The trust was valued at $1,186,953.28 as of October 31,

5

2010. The court acknowledged the trust's instruction to allocate up to 25 percent of the value of the trust at Stewart's death for improvements to Malveauxs' home but decided to approve a budget of $270,000, which was approximately 22 percent of the value of the trust as of October 31, 2010. In addition, Michelle agreed to temporarily reduce her compensation by $1,000 per month as of January 2011 in order to cover any costs of the remodel that exceeded $270,000. The court thus ordered Bank of the West to pay for the remodel up to $270,000 plus any overage that would be covered by the $1,000 per month reduction in compensation agreed to by Michelle.

In June 2011, counsel for Bank of the West wrote a letter to the Malveauxs' attorney, James Crowell, stating that Bank of the West agreed to disburse funds without further instruction from the court up to $303,545, which was the construction contract amount of $283,545 plus a $20,000 contingency. In July 2011, the contractor wrote a letter to the Malveauxs and Crowell, stating that the updated cost to complete the house was $321,425, but the total amount available from the trust was only $303,545.

On August 11, 2011, DuRoss filed a second petition, asking the court to approve the payment of up to $321,425 for the remodel. DuRoss explained that the City of Compton required modifications to the original plans that would involve additional costs. This petition is the subject of this appeal.

Bank of the West filed a response in which it stated that it did not object to the petition. However, the Bank pointed out that Ron's significant weight loss and improvements in his health might result in an extended life span. The Bank attached financial information showing that the value of the trust as of August 18, 2011 was $877,815.22. The trust was authorized by the December 2010 court order to disburse an additional $23,650 for the remodel, resulting in a value of

6

$854,165. In addition, the trust was paying conservator fees of $4,500 per month to Michelle and trustee fees of approximately $1,183 per month. Bank of the West projected that the trust would be exhausted in 15 years, but Ron's life expectancy was 29 years. The Bank accordingly expressed the concern that, although the improvements to the home raised Ron's standard of living, they did not exclusively benefit him and did not adequately consider his long term needs.

The Honorable Dudley W. Gray II presided at the September 14, 2011 hearing on the second petition. At the hearing, the court expressed concern about the granting of the first petition, reasoning that the Malveauxs' home was probably worth only $300,000 before the remodel, and the remodel nearly doubled the value of the home.

Crowell, counsel for the Malveauxs, explained the background of the Malveauxs' care for Stewart and Ron. He stated that since moving in with the Malveauxs, Ron had been asking for his own room, so the remodeling plans were designed to give him his own bathroom and bedroom and create room for his memorabilia from his parents. The house originally was 1100 square feet, and the remodel added another 1100. Crowell stated that the Malveauxs had considered simply buying a larger house to accommodate Ron, but it would have been more expensive and required funds to modify the home to suit Ron's needs. Ron was not in a wheelchair but fell sometimes because of a balance problem after losing so much weight. Therefore, the Malveauxs had installed handrails throughout the house and outside the house. DuRoss added that only an additional $25,000 was needed to pay for the upgrades required by the City of Compton.

Counsel for Bank of the West stated that it shared the court's concern that the money might not last Ron's lifetime. Nonetheless, the Bank had no objection

7

to the petition because the special trustee had made the determination that the money was appropriately spent.

Shields, the PVP attorney representing Ron, expressed concern that the trust would only last 15 years, whereas Ron's life expectancy was 29 years. He further expressed concern that, if the Malveauxs predeceased Ron, there would be no one to care for him and no money to pay for his care.

The court initially suggested that it would not approve any additional funds, expressing skepticism that the remodel would cost more than $270,000. Crowell replied that all three bids were in the low $300,000s. Crowell further explained that the $25,000 request included $7,000 for the plans and permits that had already been paid. Therefore, actually only an additional $17,000 was being requested.

The court ultimately decided to allow the trust to disburse an additional $17,500 over the $270,000 already spent, to be repaid by Michelle through the $1,000 per month reduction in her conservator fees. The court entered an order granting in part and denying in part DuRoss' petition. The court authorized Bank of the West to advance the additional sum of $17,500 for the remodel but to charge Michelle $1,000 per month by deducting this amount from her monthly compensation until the total reached $17,500. DuRoss timely appealed.

## DISCUSSION

DuRoss contends that the court erred in limiting his ability to disburse funds. We conclude that the court did not abuse its discretion.

"The probate court has wide discretion to make any order and take any action necessary or proper to dispose of matters presented by a petition under section 17200. (§ 17206.) The applicable standard of review is therefore abuse of discretion. We are mindful, however, that '[t]he abuse of discretion standard is not

8

a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' [Citation.]" (*Manson v. Shepherd* (2010) 188 Cal.App.4th 1244, 1258-1259.)

"A trustee's discretion is not unlimited . . . . If a trustee abuses her discretion, a court may order that trustee to do things differently. But whether a trustee exercises her discretion appropriately or abusively is measured by how this exercise conforms to the trustor's intent. '[T]he basic inquiry, whenever the exercise of a trustee's discretion, absolute or otherwise, is challenged, is always whether the trustee acted in the state of mind contemplated by the trustor. [Citations.]" (*Young v. McCoy* (2007) 147 Cal.App.4th 1078, 1087.)

"[I]n determining the extent of discretion conferred upon the trustees by the trustor we must look to the instrument creating the trust and resolve the question from that instrument alone. [Citations.] Since the question must be resolved without the aid of extrinsic evidence we are not bound by the construction placed upon the trust instrument by the trial court, but are required to make our own determination in accordance with applicable principles of law. [Citations.]" (*Estate of Gross* (1963) 216 Cal.App.2d 563, 566 (*Gross*).)

Relying on *Gross, supra,* 216 Cal.App.2d 563, DuRoss contends the court did not have the authority to substitute its own judgment for his regarding disbursement of funds. In *Gross*, the income beneficiary of a trust appealed the trial court's determination that the trustor vested absolute discretion in his trustees as to certain trust property and that the trustees acted in accord with the trustor's intention. The appellate court concluded that, although the trustor did not vest absolute discretion in his trustees as to the property, the trustees' decision as to the

9

property was not an unreasonable exercise of their discretion. (*Gross, supra*, 216 Cal.App.2d at pp. 566, 568.)

The *Gross* court relied on the terms of the trust and determined that, in the provision regarding the property at issue, "[t]he trustor does not here vest 'sole discretion' in his trustees, as he did in other portions of the trust instrument." (*Gross, supra*, 216 Cal.App.2d at p. 567.) The trustor accordingly had "conferred ordinary discretion upon his trustees," and the evidence indicated that the trustees' decision regarding the property was not an abuse of discretion. (*Id.* at p. 568.) The court pointed out that there was no fraud or bad faith involved, and the wisdom of the trustees' decision regarding the property was indicated by the increased value of the property "and the virtual certainty of ultimate gain for all those interested in the trust." (*Ibid.*)

We agree that a court cannot simply substitute its own judgment for that of the trustee. (*Gross, supra*, 216 Cal.App.2d at p. 568.) But the court retains authority to review a trustee's exercise of discretion to determine whether the trustee's decision accords with the trustor's intent. The record here supports the trial court's ruling.

First, in the second amendment to the trust, Stewart nominated DuRoss as the successor special trustee, whose exercise of discretion was limited to compensating Ron's conservator and paying for improvements to the home in which Ron is living. The provision stated that "the trustee may in the trustee's discretion" pay for the improvements to the home to make it convenient for Ron to live there. By contrast, under paragraph C of Article Six of the trust, DuRoss as trustee had the "sole discretion" to apply for Ron's benefit as much of the trust income and principal as needed to meet his "special needs." Thus, Stewart "demonstrated his awareness of the varying degrees of discretion which might be

10

conferred upon his trustees." (*Gross*, *supra*, 216 Cal.App.2d at p. 567.) DuRoss accordingly was given "ordinary discretion" (*id.* at p. 568) regarding the payment for improvements to the Malveauxs' home.

Second, Stewart created the trust to benefit Ron during his lifetime, unless the trust is terminated earlier. At the hearing, the court legitimately expressed concern that the large expenditure of funds from the trust would result in Ron outliving the trust funds, a result at odds with Stewart's intent. According to Bank of the West's response to DuRoss' petition, the trust's value was $877,815. The Bank already was authorized to disburse an additional $23,650 for the construction project, leaving a corpus of $854,165. Conservator fees to Michelle were $4,500 per month, although she had agreed to a $1,000 per month reduction. In addition, the Bank explained that trustee fees averaged $1,183 per month, and legal and administrative costs averaged $1,000 per month. Monthly fees accordingly averaged $5,683, which is $68,196 per year. Under a simplistic calculation, not taking interest into account, continuing to deplete the trust at that rate would mean the trust would run out of money in approximately 13 years. Yet Ron's life expectancy at the time was 29 years. Thus, unlike *Gross*, in which the trustees' exercise of discretion led to a "virtual certainty of ultimate gain for all those interested in the trust," the discretionary expenditure of funds for the improvement in the instant case created uncertainty about the trust's ability to care for Ron for the rest of his lifetime, in violation of Stewart's intent. (*Gross*, *supra*, 216 Cal.App.2d at p. 568.)

Finally, we note that, in authorizing the special trustee to pay for improvements to the home, the second amendment states that the cost "shall not exceed twenty-five (25) percent of the fair market value of the trust estate" at the time of his death. Stewart therefore did not give the special trustee absolute

11

discretion to spend the entire 25 percent of the value of the estate, but ordinary discretion to spend up to the 25 percent maximum.

Under these circumstances, the court's decision to authorize an additional expenditure of $17,500, rather than the requested $51,425, and ordering that the sum be paid by deducting $1,000 a month from the monthly conservator fee paid to Michelle, was not an abuse of discretion.

## DISPOSITION

The judgment is affirmed.  Respondent is entitled to costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.

MANELLA, J.