Filed 10/22/21  SBI Builders v. Hartford Fire Insurance CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SBI BUILDERS, INC., et al.,<br><br>     Cross-complainants and Appellants,<br><br>v.<br><br>HARTFORD FIRE INSURANCE COMPANY, et al.,<br><br>     Cross-defendants and Appellants. | H045715<br>(Santa Clara County<br>Super. Ct. No. 1-14-CV-271082) |

## I.     INTRODUCTION

This case stems from the construction of an affordable apartment complex in San Jose.  After the developer, San Jose 3rd Street Associates (3rd Street),[1] engaged SBI Builders, Inc. (SBI) to build the apartment complex, disputes arose regarding the existence of contracts, the payment due to SBI, and the scope of SBI's work on the apartment project.

The litigation in this matter began when Largo Concrete, Inc., a subcontractor of SBI, filed a complaint alleging that SBI had failed to pay Largo for its work on the apartment project.  SBI then filed a cross-complaint against 3rd Street and its associated general contractor, Pacific West Builders (PWB).  3rd Street and PWB both cross-complained against SBI.  SBI settled Largo's claims before the matter proceeded to a court trial on the cross-complaints.

---

[1] Consistent with the trial court's usage, we will refer to San Jose 3rd Street Associates as 3rd Street.

The judgment entered on February 5, 2018, incorporated the court's statement of decision following the court trial, and provided, among other things, that (1) SBI is entitled to recover $585,372 from 3rd Street and PWB (which included $489,026 for the reasonable value of SBI's services and the amount of $96,346 that SBI had paid to settle Largo's claims); (2) SBI prevailed on its mechanic's lien claim and is entitled to recover $489,026 from Hartford Fire Insurance Company (Hartford) due to Hartford's issuance of a mechanic's lien release bond; (3) the claims of 3rd Street and PWB against SBI were denied; and (4) SBI was deemed the prevailing party in this matter and was entitled to its costs from 3rd Street and PWB. In a postjudgment order the trial court denied SBI's motion for attorney fees.

On appeal, 3rd Street and PWB contend that the trial court erred in awarding SBI $96,436 and seek reversal of that portion of the judgment. On cross-appeal, SBI contends that the trial court erred because (1) the concrete podium subcontract is enforceable; (2) SBI is entitled to prejudgment interest; (3) SBI is entitled to statutory prompt payment penalties; and (4) SBI is entitled to attorney fees. For the reasons stated below, we will affirm the judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Pleadings*

#### 1. *Largo's Complaint*

This litigation began when Largo filed a complaint asserting claims related to its work on a project known as the Third Street Apartments. Largo's first amended complaint named SBI, Travelers Casualty and Surety Company of America (Travelers), and Hartford as defendants. Largo alleged that it had a subcontract with SBI to provide concrete podium work for the Third Street Apartments, which SBI breached by failing to pay Largo. Alternatively, Largo sought payment of the reasonable value of its services, to recover on the payment bond issued by Travelers, and to recover on the mechanic's lien release bond issued by Hartford. Largo is not a party to the present appeal, since its

2

claims against SBI were resolved before trial and its claims against Hartford were dismissed.

### 2. *SBI's Cross-complaint*

SBI responded to Largo's complaint by filing a cross-complaint. At the time of trial, the operative pleading was SBI's second amended cross-complaint (the cross-complaint), which named as cross-defendants PWB, 3rd Street, and Hartford. SBI alleged in its cross-complaint that 3rd Street, the property owner, and SBI had intended that SBI would be the general contractor for the entirety of the project known as Third Street Apartments located at South 3rd Street in San Jose.

SBI further alleged that the Third Street Apartments project was divided into three phases to accommodate partial funding from grants, and that the phases were known as "the Soil Remediation phase (Phase I), the Podium Structure phase (Phase II), and the Apartment Build-out phase (Phase III)." On June 27, 2013, SBI allegedly entered into a contract with 3rd Street to act as a subcontractor with the general contractor, PWB, for the concrete podium work in the amount of $2,168,216.

As work on the concrete podium progressed, SBI submitted monthly pay applications to PWB, the alleged alter ego of 3rd Street, beginning in November 2013. According to SBI, PWB failed to pay the February and March 2014 pay applications, stating that SBI should accept a different amount for the podium work. Although SBI completed its work on the concrete podium in May 2014, PWB allegedly failed to pay SBI, which left SBI unable to pay its subcontractors, including Largo. SBI asserted that under the podium contract it was owed $674,759.53.

Based on these and other allegations, SBI stated causes of action against PWB and 3rd Street for breach of contract, quantum meruit, account stated, and unjust enrichment; causes of action against PWB for indemnity, contribution, and declaratory relief; and causes of action against Hartford for release of mechanic's lien release bond and

3

assignment of Largo's rights against Hartford (the assignment cause of action was summarily adjudicated before trial).

### 3. PWB's Cross-complaint

PWB, a California licensed contractor doing business in California as Idaho Pacific West Builders Inc., filed a cross-complaint naming SBI and Travelers as cross-defendants. PWB alleged that 3rd Street was the owner of real property where an affordable housing project then known as the "Third Street Family Apartments" was built.

PWB further alleged that the construction of the "Third Street Family Apartments" was divided into three contracts, the first for soil remediation work, the second for the concrete podium, and the third for the construction of the apartments on top of the concrete podium. According to PWB, 3rd Street as owner entered into a contract with SBI for the remediation work. It was then decided that PWB would be the prime contractor for the construction of the concrete podium and the apartments, and that SBI would be PWB's subcontractor for those portions of the work.

3rd Street allegedly entered into a contract dated June 27, 2013, with SBI for the construction of the concrete podium for a total price of $2,168,216. PWB further alleged that a detailed scope of work for the concrete podium subcontract was set forth in SBI's June 5, 2013 schedule of values.

PWB stated a cause of action for breach of contract, alleging that SBI had breached the concrete podium subcontract by failing to complete all of the work that SBI had agreed to perform. PWB also alleged that SBI breached the podium subcontract by failing to pay its lower tier subcontractors, which caused these subcontractors to file mechanic's liens against the Third Street Apartments project. PWB also stated causes of action against SBI for indemnity, contribution, and declaratory relief, plus a cause of action against SBI and Travelers for breach of obligation to pay claims under the payment and performance bond issued by Travelers to SBI for its work on the project.

4

### 4.    3rd Street's Cross-complaint

3rd Street, a limited partnership, and its general administrative partner, TPC Holdings IV, LLC (TPC Holdings), filed a cross-complaint against cross-defendant SBI. 3rd Street alleged that a real estate developer named Global Premier had intended to construct an affordable housing apartment complex with SBI as the contractor. Eventually, the apartment project was taken over by 3rd Street.  SBI allegedly represented to 3rd Street that the project was essentially fully designed, that SBI wanted to perform the entire project, and that SBI could provide reasonably accurate "cost pricing" for completing the project.

According to 3rd Street, SBI and 3rd Street agreed that if 3rd Street purchased the property where the apartment complex was to be built, and SBI agreed to a price for the entire project, the work would be divided into three contracts:  (1) a prime contract between 3rd Street and SBI for the soil remediation and site work; (2) a prime contract between 3rd Street and PWB as general contractor for the concrete podium work with a subcontract between PWB and SBI; and (3) a prime contract with 3rd Street and PWB as general contractor for the apartments/superstructure with a subcontract between PWB and SBI.

Before purchasing the property where the apartment complex was to be built, 3rd Street allegedly asked SBI to provide a schedule of values for all three parts of the project.  SBI provided a schedule of values dated March 5, 2013, which 3rd Street asserts had three columns showing SBI's pricing for the tasks associated with each part of the project, including one column for the soil remediation work, a middle column for the concrete podium work, and a third column for the apartment/superstructure work, for a total overall project price of $6,840,245.  According to 3rd Street, the March 5, 2013 schedule of values showed that SBI's price for the "tasks/scope of work" for the concrete podium work was $2,168,216.

5

3rd Street subsequently determined that due to a budget shortfall the apartment project was not economically feasible and it would not purchase the property. SBI then agreed to a price reduction. In exchange for a price reduction of $100,000, SBI received a promissory note in the amount of $100,000 from TPC Holdings. 3rd Street then entered into the proposed prime contracts with PWB for the concrete podium and the apartments/superstructure.

3rd Street further alleged that on June 27, 2013, SBI entered into a written subcontract with PWB for construction of the concrete podium in the amount of $2,168,216. Relying on SBI's execution of the concrete podium subcontract and SBI's alleged agreement that it could complete the entire project for $6,840,245 less the $100,000 reduction, 3rd Street purchased the property where the apartment complex was to be built.

Thereafter, 3rd Street agreed to an SBI change order in the amount of $95,200 to pay prevailing wages to Largo, which increased the cost of the concrete podium contract to $2,263,416. A dispute then arose between the parties where, according to 3rd Street, SBI demanded to be paid more than the agreed-upon price to complete the concrete podium and the apartment/superstructure. SBI then allegedly agreed that PWB would "take back" certain scopes of work for the concrete podium and SBI would not receive the full contract price of $2,168,216. 3rd Street's offer to pay SBI for supervising the new subcontractors obtained by PWB to complete the concrete podium work was allegedly refused by SBI. 3rd Street later learned that SBI had failed to pay its subcontractors for their work on the concrete podium and that numerous mechanic's liens had been filed against the property.

Based on these and other allegations, 3rd Street stated causes of action for breach of the remediation contract, contractual indemnity, equitable indemnity, breach of agreement to perform the entire project for $6,740,245 (including a third party

6

beneficiary claim for breach of the concrete podium subcontract), and cancellation of the $100,000 promissory note.

### B.    The Court Trial

The action on the cross-complaints of SBI, PWB, and 3rd Street proceeded to a lengthy court trial. We provide a brief summary of the pertinent evidence admitted at trial.[2]

The CEO and President of both PWB and Pacific West Communities, Caleb Roope, testified that PWB is a general construction company and Pacific West Communities is a real estate developer that specializes in the development and construction of affordable housing. Pacific West Communities became involved in the Third Street Apartments project in 2012 when a competitor, Global Premier, introduced them to the project. Global Premier had begun the project as a design/build project with SBI, a San Jose general contractor. Paul Nuytten, the president of SBI, described SBI as a general contractor that hires subcontractors and coordinates their work on construction projects.

Pacific West Communities eventually decided to take over the Third Street Apartments project from Global Premier, which had run into financial difficulties. A limited partnership, 3rd Street, was formed specific to the Third Street Apartments project in anticipation of the assignment of a CALReUSE grant for remediation of the project site. TCP Holdings is the general administrative partner of 3rd Street. Roope is the manager and owner of TCP Holdings.

In the course of deciding whether to take over the Third Street Apartments project, 3rd Street began working with SBI. It was decided that the project would involve three separate contracts due to grant funding requirements, including a remediation contract, a concrete podium contract, and an apartments/superstructure contract. In November 2012,

---

[2] The July 1, 2021 motion of 3rd Street/PWB to augment the record with respect to certain exhibits is granted.

SBI and 3rd Street entered into a $546,500 contract for remediation of the project site for the Third Street Apartments exhibit A to the remediation contract specified the scope of work to be performed under the contract. It is undisputed that SBI completed the work on the remediation contract, and that SBI was later provided with the apartment contract but never signed it.

By March 2013, SBI was planning to build the entire Third Street Apartments project. Roope received an updated schedule of values dated March 5, 2013, from SBI that Nuytten had prepared due to cost increases.[3] Roope understood the March 5, 2013 schedule of values to show that SBI's total construction cost for the project would be $6,840,245, excluding change orders.

Since Roope had asked SBI to separate out the costs for the site work, the concrete podium, and the apartments/superstructure, the March 5, 2013 schedule of values included line items for the concrete podium portion of the project that totaled $2,168,216. Roope relied on SBI's March 5, 2013 schedule of values in deciding whether to go ahead with the Third Street Apartments project.

In April 2013 Roope determined that the Third Street Apartments project had a funding shortfall that would prevent the project from going forward. SBI and other participants in the project then agreed to give price reductions to save the project. SBI agreed to reduce its total project cost by $100,000 in exchange for a promissory note from TCP Holdings in the amount of $100,000. Roope believed that the $100,000 promissory note was consideration given to SBI to perform the construction work for the entire project, and he relied on an oral agreement with SBI to complete the entire project for $6,740,245 before closing escrow on the property for the project site. Although Roope acknowledged that he normally did not use oral agreements, he believed that the

---

[3] Roope refers to the March 5, 2013 document as a "schedule of values" and Nuytten refers to the same document as a "cost estimate." In accordance with the trial court's usage, we will refer to the March 5, 2013 document as a schedule of values.

oral agreement with SBI in the amount of $6,740,245 was enforceable because it had been confirmed in writing and SBI was proceeding in good faith. However, Nuytten testified that he did not know of anyone in the construction industry using oral contracts, and he denied that SBI had entered into an oral agreement to build the whole project for approximately $6.8 million.

Further, Nuytten did not believe that the March 5, 2013 schedule of values constituted the scope of work for a contract to build the Third Street Apartments project. At the time he prepared the March 5, 2013 schedule of values Nuytten understood that the project did not require payment of prevailing wages, and therefore the higher cost of prevailing wages was not included in the March 5, 2013 schedule of values. However, in June 2013 Nuytten was informed that prevailing wages were required for a part of the project funded by an infill grant.

In June 2013 SBI was still planning to build the entire Third Street Apartments project from start to finish. The next contract that SBI signed was the subcontract with PWB to build the concrete podium. Nuytten signed the concrete podium subcontract on behalf of SBI on June 27, 2013, under pressure to sign the subcontract immediately due to a financing deadline. The concrete podium subcontract in the amount of $2,168,216 expressly provided that it was a "State Prevailing Wage Contract." SBI later added a change order for $95,200 to pay prevailing wages to a non-prevailing wage subcontractor.

Regarding the scope of work, the June 27, 2013 concrete podium subcontract provided as follows at paragraph III: "**A. Subcontractor's Scope of Work:** Subcontractor agrees to furnish all labor, services, materials, equipment and other facilities of every kind and description, temporary or permanent, required for the prompt and efficient performance of the complete scope of work ('Subcontract Work') described in Scope of Work attached as Exhibit 'A' [and] the plans and specifications listed in

9

Exhibit 'B' which are hereby made a part hereof, and all requirements of the Contract Documents (defined in Section IV below)."

It was undisputed that neither exhibit A nor exhibit B were attached to the concrete podium subcontract. Zack Deboi, the chief financial officer for Pacific West Communities and PWB, testified that when he sent SBI a proposed subcontract for the concrete podium he believed that exhibit A would be SBI's March 5, 2013 schedule of values. However, Deboi acknowledged that there was no exhibit A attached to the concrete podium subcontract when it was signed. Deboi also acknowledged that it was his responsibility to attach the exhibit A scope of work to the concrete podium subcontract, and that no exhibit A was prepared or attached.

However, Deboi maintained that SBI had implied during contract negotiations that the March 5, 2013 schedule of values showed the scope of work for the concrete podium subcontract. Nuytten denied that the line items in the concrete podium column included in SBI's March 5, 2013 schedule of values constituted the scope of work for the concrete podium subcontract. According to Nuytten, as of June 27, 2013, the date the concrete podium contract was signed, there was no agreed-upon scope of work.

In August 2013 SBI began working on the site remediation portion of the project under the remediation contract that SBI had previously signed. The increasing costs of the project then became a concern. In October 2013 Nuytten provided an updated schedule of values to PWB because SBI was over budget on the project due to market conditions and the requirement to pay prevailing wages.

At the end of October 2013 Nuytten was advised by Zack Deboi that the remaining work on the project would be transitioned to PWB. Deboi intended that the $2,168,216 price for the concrete podium subcontract would be reduced by the amounts from SBI's March 5, 2013 schedule of values that PWB would now pay instead of SBI, such as the cost of plumbing, electrical, and elevator work. By early November 2013 the work on the concrete podium had just begun. At that point, it was determined that SBI

10

would continue to coordinate the subcontractors working on the concrete podium and then hand off the project after the top of the podium was completed. SBI's work on the concrete podium was substantially completed in April 2014. The concrete podium was finally completed in June 2014.

While working on the Third Street Apartments project, SBI sent a monthly payment application to PWB. A payment application is a request for payment based upon the percentage of work that has been completed. Deboi, as chief financial officer for PWB, recalled that he paid SBI's pay applications for November 2013, December 2013, January 2014, and February 2014. However, he deducted $88,000 from the February 2014 pay application and $32,000 from the March 2014 pay application. Deboi did not pay either SBI's April 2014 pay application or SBI's retention pay application. James Amlicke, who was SBI's chief operations and financial officer, stated that Deboi paid only three of the six pay applications submitted by SBI.

In total, Deboi paid SBI $1,603,562.06 on the concrete podium subcontract, which Amlicke noted was less than the SBI's cost for the job. Deboi's calculation of the amount owed to SBI included a deduction of $173,400 for not completing the concrete topping slab and a deduction for work that PWB took back and paid directly to the subcontractors. Deboi later learned that a concrete topping slab was excluded from Largo's subcontract with SBI and conceded that the March 5, 2013 schedule of values did not include a line item for a concrete topping slab. In September 2014 SBI filed a mechanic's lien in the amount of $674,759, which was the amount SBI claimed it was owed for its work on the concrete podium contract.

David Ross, SBI's construction expert, provided several opinions regarding custom and practice in the construction industry. In Ross's opinion, it was not industry custom and practice for commercial contractors to utilize oral agreements due to the complexity of construction contracts in large scale construction projects. Ross defined "scope of work" as a "narrative description of the elements of the project." He

11

determined that the March 5, 2013 schedule of values was a cost breakdown and not a scope of work consistent with industry custom and practice, stating that the schedule of values would typically be attached to the contractor's pay applications.

The parties each presented an accounting expert to support its damages claim. SBI's expert, Steven Matthew Hoslett, is a certified public accountant specializing in forensic accounting. Hoslett's calculations included the cost to SBI of settling Largo's claims in the amount of $96,000. Using four different methods of calculating SBI's loss on the concrete podium subcontract, Hoslett determined that SBI's losses could be calculated as either $771,105.53; $671,538; $564,207; or $585,372.

The accounting expert for 3rd Street and PWB, Steve Morang, provided opinions regarding their damages related to the concrete podium subcontract, the total project cost, and the promissory note. To calculate the damages relating to the concrete podium subcontract, Morang deducted the scopes of work that SBI did not perform from the contract price plus change orders, and concluded that SBI owed $14,788.47. Morang further determined that the damages related to the overall project totaled $1,038,261.53. Morang also stated that it was his opinion that the damages from the promissory note issued by TPC Holdings to SBI was $100,000, which was the amount of the promissory note if the note was not invalidated by the court.

### C.    *Statement of Decision and Judgment*

On December 15, 2017, the trial court provided an oral statement of decision in a ruling from the bench and directed counsel for SBI, the prevailing party, to prepare a tentative statement of decision. After 3rd Street/PWB filed objections to the tentative statement of decision submitted by SBI, the final statement of decision was filed on January 26, 2018.

In the statement of decision, the trial court made several rulings. Preliminarily, the trial court ruled that 3rd Street and PWB were agents of each other, and there was no

12

substantive difference between them for purposes of this matter.[4]  Regarding the parties'
contract claims, the trial court found that (1) there was no oral "umbrella" agreement
between 3rd Street/PWB and SBI that obligated SBI to build the entire Third Street
Apartments project for $6.8 million;  (2) the parties did not agree on the scope of work
for the concrete podium contract; (3) SBI is entitled to damages in the amount of
$489,026,[5] which is the reasonable value of the work SBI performed on the concrete
podium contract;  and (4) all breach of contract claims by 3rd Street/PWB are denied.

The trial court also ruled that SBI was entitled to foreclose on its mechanic's lien,
and therefore SBI was entitled to recover $489,026 from Hartford, which had issued a
mechanic's lien release bond.[6]  In addition, the trial court found that SBI had reasonably
mitigated its damages by resolving Largo's claim against SBI and was entitled to recover
the settlement amount of $96,346.  However, the trial court rejected SBI's claims that it
was entitled to prejudgment interest and prompt payment penalties, finding that these
claims were barred by the "uncertainty about the actual costs of the work as reflected by
the dispute."

Finally, the trial court ruled that the $100,000 promissory note given to SBI should
be cancelled because "the note was given in connection with a reduced price to perform
the entire Project and because SBI did not perform the entire Project."

---

[4] Consistent with the trial court's finding and for ease of reference, we will refer to
3rd Street and PWB henceforth collectively as 3rd Street/PWB.

[5] The trial court's award of $489,026 for the reasonable value of SBI's services
appears to be based upon the fourth method of damages calculation stated by SBI's
damages expert, and does not include the amount of $96,346 that SBI paid to settle the
Largo lawsuit.  No issue has been raised on appeal as to the amount of $489,026 awarded
for the reasonable value of SBI's services.

[6] "The purpose of the release bond procedure is to provide a means by which,
before a final determination of the lien claimant's rights and without prejudice to those
rights, the property may be freed of the lien, so that it may be sold, developed, or used as
security for a loan." (*Hutnick v. United States Fidelity & Guaranty Co.* (1988) 47 Cal. 3d
456, 462; Civ. Code, § 8424 [lien release bond].)

The judgment entered on February 5, 2018 incorporated the statement of decision and provided that (1) SBI is entitled to recover $585,372 from 3rd Street and PWB; (2) SBI prevailed on its mechanic's lien claim and is entitled to recover $489,026 from Hartford due to Hartford's issuance of the mechanic's lien release bond; (3) the claims of 3rd Street and PWB against SBI are denied; (4) the $100,000 promissory note given to SBI by TPC Holdings is canceled, and there was no prevailing party on the cause of action relating to the promissory note; and (5) SBI is the prevailing party in this matter and entitled to its costs from 3rd Street and PWB.

In the July 18, 2018 postjudgment order, the trial court denied SBI's motion for attorney fees, ruling that there was no basis for an award of attorney fees to SBI because there was no contract between 3rd Street/PWB and SBI. In the same order, the trial court awarded SBI costs in the amount of $36,313. An amended judgment was entered on August 23, 2018 that included the award of costs.

## III. SBI'S CROSS-APPEAL

We will begin our review with SBI's cross-appeal since the issues on cross-appeal include the threshold issue of the enforceability of the concrete podium subcontract. On cross-appeal, SBI contends that the trial court erred because (1) the concrete podium subcontract is enforceable; (2) SBI is entitled to prejudgment interest; (3) SBI is entitled to statutory prompt payment penalties; and (4) SBI is entitled to attorney fees. We first address the standard of review that applies where, as here, the judgment is based upon a statement of decision following a court trial.

### A. *Standard of Review*

On appeal, the general rule is that " '[a]ll intendments and presumptions are indulged to support [the judgment] on matters as to which the record is silent, and error must be affirmatively shown.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.)

14

More specifically, " 'in reviewing a judgment based upon a statement of decision following a bench trial, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision. [Citations.]" [Citation.] In a substantial evidence challenge to a judgment, the appellate court will "consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]" [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment. [Citation.]' [Citation.] The appellant has the burden of demonstrating that 'there is no substantial evidence to support the challenged findings.' [Citation.]" (*Manson v. Shepherd* (2010) 188 Cal.App.4th 1244, 1264 (*Manson*).)

Additionally, "[t]he doctrine of implied findings requires the appellate court to infer the trial court made all factual findings necessary to support the judgment. [Citation]." (*Fladeboe v. American Isuzu Motors Inc*. (2007) 150 Cal.App.4th 42, 58 (*Fladeboe*).) "If the party challenging the statement of decision fails to bring omissions or ambiguities in it to the trial court's attention, then, under Code of Civil Procedure section 634, the appellate court will infer the trial court made implied factual findings favorable to the prevailing party on all issues necessary to support the judgment, including the omitted or ambiguously resolved issues. [Citations.] The appellate court then reviews the implied factual findings under the substantial evidence standard. [Citations.]" (*Id.* at pp. 59-60.)

### B. The Concrete Podium Subcontract

#### 1. Background

In the statement of decision, the trial court found "that the parties did not agree on the scope of work of the Podium Contract. While the dispute would likely have been avoided had 3rd St/PWB attached an exhibit A scope of work to the Podium Contract

15

when the parties executed the contract, it did not do that. It was 3rd St/PWB's obligation to do so, it was their form of contract, and they drafted it."

The trial court further found, as stated in the court's ruling from the bench, that SBI was entitled to recover the reasonable value of its services for its work on the concrete podium: "I think that [SBI] are entitled to quantum meruit. . . . [¶] So based upon that I think that they [are] entitled to the reasonable value of the services that were performed and I accept SBI's damages . . . . "[7] Although the trial court did not expressly rule that the concrete podium subcontract was unenforceable, that ruling is implicit in the court's ruling from the bench that SBI was entitled to recover in quantum meruit. (See *Reeve v. Meleyco* (2020) 46 Cal.App.5th 1092, 1101 [theory of quantum meruit allows recovery of the reasonable value of services where there is no enforceable contract].)

### 2. *The Parties' Contentions*

SBI contends that the applicable standard of review is de novo, and under that standard, this court should determine that the trial court erred in finding that the concrete podium subcontract is unenforceable. According to SBI, the concrete podium subcontract should be enforced because the evidence shows that the subcontract was sufficiently certain. Specifically, SBI argues that SBI's pre-dispute conduct in completing the work on the concrete podium, combined with the conduct of 3rd Street/PWB in paying SBI's pay applications, shows that the parties mutually intended to be bound by the concrete podium subcontract.

3rd Street/PWB responds that the correct standard of review is substantial evidence. Under that standard, 3rd Street/PWB argues, substantial evidence supports the

---

[7] We may consider the trial court's oral ruling from the bench where it is consistent with the judgment. "There are instances in which a court's oral comments may be valuable in illustrating the trial judge's theory, but they may never be used to impeach the order or judgment on appeal. [Citation.]" (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 268.)

16

trial court's finding that the concrete podium subcontract is uncertain, and therefore unenforceable, because the parties did not agree as to the scope of work.

### 3. Analysis

Regarding uncertainty, this court has stated: " 'The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.' [Citations.] But '[i]f . . . a supposed "contract" does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract.' [Citation.]" (*Bustamante v. Intuit, Inc*. (2006) 141 Cal.App.4th 199, 209 (*Bustamante*).)

As to the standard of review, "[w]hen a trial court's construction of a written agreement is challenged on appeal, the scope and standard of review depend on whether the trial judge admitted *conflicting* extrinsic evidence to resolve any ambiguity or uncertainty in the contract. If extrinsic evidence was admitted, and *if* that evidence was in conflict, then we apply the substantial evidence rule to the factual findings made by the trial court. But if no extrinsic evidence was admitted, or if . . . the evidence was not in conflict, we independently construe the writing. [Citations.]" (*De Anza Enterprises v. Johnson* (2002) 104 Cal.App.4th 1307, 1315 (*De Anza*).)

In the present case, it was undisputed that the concrete podium subcontract lacked exhibit A, which specified the scope of work, and therefore the trial court admitted extrinsic evidence to resolve the uncertainty as to the intended scope of work for the subcontract. Accordingly, the applicable standard of review is substantial evidence. (See *De Anza*, *supra*, 104 Cal.App.4th at p. 1315.) Our review is therefore limited to determining whether substantial evidence supports the trial court's findings that the concrete podium subcontract was unenforceable due to uncertainty regarding the scope of work. We reiterate that in applying the substantial evidence standard of review, we do

17

not reweigh the evidence and are bound by the trial court's credibility determinations. (*Manson*, *supra*, 188 Cal.App.4th at p. 1264.)

We determine that the testimony of Deboi and Nuytten constitutes substantial evidence that, in the undisputed absence of exhibit A, the parties never reached an agreement as to the scope of work for the concrete podium subcontract. Deboi testified that SBI had implied during contract negotiations that the March 5, 2013 schedule of values showed the scope of work for the concrete podium subcontract. However, Nuytten denied that the line items in the concrete podium column included in SBI's March 5, 2013 schedule of values constituted the scope of work for the concrete podium subcontract. According to Nuytten, as of June 27, 2013, the date the concrete podium contract was signed, there was no agreed-upon scope of work. The evidence further shows that a few months later, when SBI's work on the concrete podium had just begun, 3rd Street/PWB decided that PWB would take over SBI's work on the concrete podium. It was also decided that SBI would continue to coordinate the subcontractors working on the concrete podium and then hand off the project after the top of the podium was completed. The testimony of the parties' witnesses shows that thereafter disputes arose between 3rd Street/PWB and SBI regarding whether SBI had performed its scope of work and the amount that SBI should be paid for its work on the concrete podium.

Since the concrete podium subcontract lacked an express scope of work because no exhibit A was attached to the subcontract, and substantial evidence shows that there was no agreed-upon scope of work, the supposed concrete podium subcontract does not provide a basis for determining SBI's obligations. (See *Bustamante*, *supra,* 141 Cal.App.4th at p. 209.) Consequently, it is not possible to determine whether SBI breached its obligations with respect to the concrete podium. (See *ibid.*) We therefore conclude that the trial court did not err in finding that the concrete podium subcontract was unenforceable due to uncertainty regarding the scope of work.

We are not convinced by SBI's argument to the contrary that SBI's pre-dispute conduct in completing the work on the concrete podium, together with 3rd Street/PWB's payment of SBI's pay applications, shows that the parties mutually intended to be bound by the concrete podium subcontract. This argument asks us to perform an independent review of the evidence presented at the court trial, which we may not do, since, as we have discussed, the applicable standard of review is substantial evidence. (See *DeAnza*, *supra*, 104 Cal.App.4th at p. 1315; *Manson*, *supra*, 188 Cal.App.4th at p. 1264.)

We are also not convinced by SBI's argument that the concrete podium subcontract should be enforced because the law disfavors finding a contract is unenforceable due to uncertainty. SBI relies on *Patel v. Liebermensch* (2008) 45 Cal.4th 344 (*Patel*) and *Bohman v. Berg* (1960) 54 Cal.2d 787 (*Bohman*), but these decisions are distinguishable.

In *Patel*, the California Supreme Court stated the general rule that "[t]he equitable remedy of specific performance cannot be granted if the terms of a contract are not certain enough for the court to know what to enforce. (Civ.Code, § 3390, subd. 5; [citation]). However, ' " '[t]he law does not favor but leans against the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if [they] can be ascertained.[]' " ' [Citations.]" (*Patel*, *supra*, 45 Cal.4th at p. 349.) The issue in *Patel* was whether a real estate purchase agreement was enforceable although the escrow period was not specified in the contract. (*Id*. at p. 350.) Our Supreme Court ruled that the specific performance of the purchase agreement could be decreed because the essential terms of the parties' agreement were easily ascertainable and, where the time of payment is not specified, a reasonable period is allowable under Civil Code section 1657.[8] (*Patel*, *supra*, at p. 352.) In contrast, in the present case the trial court implicitly found that an essential term in the

_____

[8] All further statutory references are to the Civil Code unless otherwise indicated.

19

parties' concrete podium subcontract—the scope of work—was not easily ascertainable, and we have determined that substantial evidence supports the trial court's ruling that the subcontract was unenforceable due to uncertainty.

In *Bohman*, our Supreme Court stated that "[i]t is well-settled law that, although an agreement may be indefinite or uncertain in its inception, subsequent performance by the parties under the agreement will cure this defect and render it enforceable. When one party performs under the contract and the other party accepts his performance without objection it is assumed that this was the performance contemplated by the agreement. [Citations.]" (*Bohman*, *supra*, 54 Cal.2d at pp. 794-795.) The issue in *Bohman* was whether the parties' agreement for conversion of a Greyhound bus was sufficiently certain to be enforceable at the $25,000 contract price after the plaintiff performed additional work outside the items specified in the contract. (*Id*. at pp. 792-793.) The Supreme Court ruled that the evidence showed that "both parties clearly understood what was meant by the terms of their agreement. The plaintiff subsequently performed under the terms of the agreement. He is therefore bound by all of the terms of that contract, including the price established therein." (*Id*. at pp. 797-798.) The decision in *Bohman* is distinguishable from the present case, where we have determined that substantial evidence supports the trial court's implicit finding that the parties did not clearly understand SBI's scope of work under the concrete podium subcontract in the absence of exhibit A.

Having concluded on the merits that the trial court did not err in ruling that the concrete podium subcontract is unenforceable, we need not address 3rd Street/PWB's contentions that SBI's arguments with respect to the enforceability of the concrete podium subcontract are barred under the principles of waiver, estoppel, and invited error.

### C. Prejudgment Interest

#### 1. Background

In the statement of decision, the trial court noted that SBI claimed that "it was entitled to pre-judgment interest at 10% under Civil Code section 3287(1) [*sic*] and (b)." The trial court denied SBI's claim for prejudgment interest "because of the uncertainty about the actual costs of the work as reflected by the dispute."

During the trial court's ruling from the bench, the court stated that "the issue of prejudgment interest . . . I have more of a problem with that because I think to be entitled to prejudgment interest it has to be a liquidated amount. And there was still a lot of questions in my mind as to how you determine the damages and so on. So to that extent I don't think that you're entitled to prejudgment interest."

#### 2. The Parties' Contentions

We understand SBI to contend that, even if this court determines that the trial court correctly ruled that the concrete podium subcontract is unenforceable, SBI is entitled to an award of prejudgment interest under section 3287, subdivision (b) on both the award of damages in quantum meruit and the recovery on its mechanic's lien foreclosure action. 3rd Street/PWB disagrees, arguing that SBI has failed to show that the trial court abused its discretion in denying prejudgment interest under section 3287, subdivision (b).

#### 3. Analysis

Section 3287, subdivision (b) provides: "Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed."

As this court recently stated, "[b]y allowing the trial court to consider awarding prejudgment interest on an unliquidated contractual claim within the limits prescribed by

21

the statute, section 3287(b) aims 'to balance the concern for fairness to the debtor against the concern for full compensation to the wronged party.' [Citation.]" (*Hewlett-Packard Co. v. Oracle Corporation* (2021) 65 Cal.App. 5th 506, 576 (*Hewlett-Packard*).)

It has been held that quantum meruit constitutes a cause of action in contract for purposes of section 3287, subdivision (b), and therefore a discretionary award of prejudgment interest is permissible where damages are awarded under a theory of quantum meruit. (*George v. Double-D Foods, Inc*. (1984) 155 Cal.App.3d 36, 47.) Further, this court has determined that "a mechanic's lien foreclosure action is sufficiently like a contract action to be considered a 'cause of action in contract' for purposes of section 3287[, subdivision] (b)." (*Carmel Development Co., Inc. v. Anderson* (2020) 48 Cal.App.5th 492, 524 (*Carmel Development*).)

The standard of review for an order awarding or denying prejudgment interest under section 3287, subdivision (b) is abuse of discretion. (*Carmel Development*, *supra*, 48 Cal.App.5th at p. 524.) However, as this court has recognized, "[t]here is no authoritative list of criteria for courts to consider, and '[f]ew cases have discussed the standards by which a trial court's exercise of discretion under section 3287, subdivision (b) [is] to be judged.' [Citation.]" (*Hewlett-Packard*, *supra*, 65 Cal.App.5th at p. 577.)

Nevertheless, "[a] determination that, in the particular circumstances of the case, a prejudgment interest award would be permissible in the exercise of the court's discretion, . . . does not compel the conclusion that the denial of such an award in similar circumstances would be an abuse of discretion. [Citation.] Instead, we must affirm the denial if there was a reasonable basis for the court's decision in accordance with the governing rules of law. [Citations.]" (*Faigin v. Signature Group Holdings, Inc.* (2012) 211 Cal.App.4th 726, 752.)

We determine that under the doctrine of implied findings and the circumstances of this case SBI has not shown the trial court abused its discretion in denying prejudgment

interest.  Under the doctrine of implied findings, as we have discussed, "[i]f the party challenging the statement of decision fails to bring omissions or ambiguities in it to the trial court's attention, then, under Code of Civil Procedure section 634, the appellate court will infer the trial court made implied factual findings favorable to the prevailing party on all issues necessary to support the judgment, including the omitted or ambiguously resolved issues.  [Citations.]  The appellate court then reviews the implied factual findings under the substantial evidence standard.  [Citations.]"  (*Fladeboe*, *supra*, 150 Cal.App.4th at pp. 59-60.)

Here, the trial court's statement of decision did not make express findings regarding its exercise of discretion with respect to prejudgment interest, other than a ruling that prejudgment interest was denied because the costs of SBI's work were uncertain as reflected in the parties' dispute.  Thus, the statement of decision did not include an express ruling on whether SBI was entitled to an award of prejudgment interest because it prevailed on its claim against Hartford on the mechanic's lien release bond.

We observe that SBI did not bring this omission in the statement of decision to the trial court's attention.  Accordingly, we will infer that the trial court made implied factual findings to support an exercise of the court's discretion to deny prejudgment interest on SBI's foreclosure on the mechanic's lien release bond.  (See *Fladeboe*, *supra*, 150 Cal.App.4th at pp. 59-60.)  Here, the trial court ruled that SBI was entitled to foreclose on its mechanic's lien and was entitled to recover $489,026 from Hartford on the mechanic's lien release bond.  The amount of $489,026 duplicated the amount of $489,026 that the trial court awarded SBI for the reasonable value of SBI's services.  However, the trial court clarified during the court's ruling from the bench that the order that SBI was entitled to foreclose on Hartford's mechanic's lien release bond did not allow a double recovery, to the extent the foreclosure duplicated another judgment.  Accordingly, we

23

determine that the trial court could reasonably deny an award of prejudgment interest on SBI's recovery on the mechanic's lien release bond.

As to SBI's claim for prejudgment interest on the award of damages in quantum meruit, under the applicable standard of review we similarly determine that reasonable inferences support the trial court's exercise of its discretion to deny prejudgment interest under section 3287, subdivision (b). Although this court has stated that "it would appear contrary to the statutory scheme for the trial court to *refuse* prejudgment interest for the sole reason that the amount of damages was highly uncertain" (*Hewlett-Packard*, *supra*, 65 Cal.App. 5th at p. 576), we must resolve all reasonable inferences to be drawn from the facts in support of the trial court's decision. (See *Manson*, *supra*, 188 Cal.App.4th at p. 1264.) Based on the evidence presented at the court trial, we may reasonably infer that the trial court, in denying prejudgment interest, balanced the concern for fairness to 3rd Street/PWB against the concern for full compensation to SBI as the wronged party. (See *Hewlett-Packard*, *supra*, at p. 576.) The substantial evidence supporting the trial court's implied balancing of these concerns includes the evidence showing that all parties proceeded without an agreed-upon scope of work for the concrete podium subcontract; there was uncertainty between the parties as to the scope of work that SBI was obligated to perform; and there was uncertainty as to the payment that SBI was entitled to receive for its work.

For these reasons, we determine that SBI has not shown that the trial court abused its discretion in denying prejudgment interest in this case.

**D.** ***Prompt Payment Penalties***

*1. Background*

In the statement of decision, the trial court denied SBI's claim for statutory prompt payment penalties under Business and Professions Code section 7108.5 and sections 8814 and 8818 on the ground of the uncertainty of the actual costs of SBI's work as reflected in the parties' dispute.

24

In ruling from the bench, the trial court stated its reasoning as follows: "I think that because of the fact of the finding that I made that there is no contract that you're not entitled to any prompt payment penalties. I don't see any bad faith. We're talking about operating in good faith. I don't see any bad faith on the part of Pacific West Builders. [¶] On the other hand kind of got sloppy with failing to nail down that contract because I mean we have pages and pages of e-mails and various things you know wanting to modify this and wanting to change this and that and everything else. SBI is saying we can no longer . . . do this for the amount we initially stated in the March statement and yet it never really gets dealt with. There's just all these issues that are uncertain. [¶] But I do believe that there was no bad faith on the part of Pacific West Builders so I would not find any prompt payment penalties."

### 2. The Parties' Contentions

SBI contends that the trial court erred in denying its claim for statutory prompt payment penalties because substantial evidence does not support the trial court's finding that PWB acted in objective good faith in withholding payments to SBI. According to SBI, a detailed review of the testimony of PWB's chief financial officer, Zack Deboi, and the record of PWB's payments to SBI shows that PWB had no justification for withholding payments to SBI, and therefore PWB did not act in objective good faith.

3rd Street/PWB argues that the trial court properly denied SBI's claim for statutory prompt payment penalties because the parties did not have a contract, and therefore no payments were due to SBI under a contract. Further, 3rd Street/PWB argues that ample substantial evidence supports the trial court's finding that PWB acted in good faith.

### 3. Analysis

The Legislature has enacted a statutory scheme that "imposes comprehensive deadlines for both progress and retention payments from owners to direct contractors, and in turn from direct contractors to their subcontractors, for both public and private

projects. [Citations.]" (*United Riggers & Erectors, Inc. v. Coast Iron & Steel Co*. (2018) 4 Cal.5th 1082, 1088 (*United Riggers*); see § 8814 [time for retention payments] § 8818 [failure to make timely retention payment]; Bus. & Prof. Code, § 7108.5 [payment to subcontractors].)

"The deadlines are enforced by statutory penalties, typically 2 percent of the unpaid amount per month, and by fee-shifting provisions that make the losing party responsible for attorney fees if a lawsuit is required to enforce the right to payment." (*United Riggers*, *supra*, 4 Cal.5th at p. 1088).) Moreover, "timely payment may be excused only when the payor has a good faith basis for contesting the payee's right to receive the specific monies that are withheld." (*Id*. at p. 1098; see also *FEI Enterprises, Inc. v. Yoon* (2011) 194 Cal.App.4th 790, 797 (*FEI Enterprises*) [Bus. & Prof. Code, § 7108.5 provides contractor may withhold progress payments from subcontract where good faith dispute over amount owed].)

It has been held that the good faith exception is objective, meaning that it is "based on the examination of objective facts and circumstances which will or will not demonstrate that an objectively reasonable basis existed for the non-paying party's action." (*FEI Enterprises*, *supra,* 194 Cal.App.4th at p. 806; but see *Alpha Mechanical, Heating & Air Conditioning, Inc. v. Travelers Casualty & Surety Co.* (2005) 133 Cal. App.4th 1319, 1339 [standard for good faith dispute under prompt payment statutes is subjective].)

In the present case, we will assume, without deciding, that the objective standard for a good faith dispute under the prompt payment statutory scheme applies. (*FEI Enterprises*, *supra,* 194 Cal.App.4th at p. 806.) We review the trial court's finding of good faith under the substantial evidence standard of review. (*Id*. at p. 807, fn. 13.)

We emphasize that our analysis is governed by the substantial evidence standard of review that, as we have discussed, applies in an appellate challenge to a judgment based upon a statement of decision following a court trial: we resolve any conflict in the

evidence or reasonable inferences to be drawn from the facts in support of the trial court's decision, and we may not reweigh the evidence and are bound by the trial court's credibility determinations. (*Manson*, *supra*, 188 Cal.App.4th at p. 1264.) In other words, we must "determine whether there is substantial evidence to support the conclusion of the trier of fact even [if] there is contrary evidence equal to, or even greater than, that which favors the trial court's decision." (*Kallman v. Henderson* (1965) 234 Cal.App.2d 91, 96 (*Kallman*).)

Applying that standard, we find that substantial evidence supports the trial court's determination that PWB acted in good faith in withholding payment, since the concrete podium subcontract was not enforceable and there was evidence of uncertainty between the parties as to the scope of work that SBI was obligated to perform and the payment that SBI was entitled to receive. Even if, as SBI argues, a detailed review of the parties' testimony and the record of payments would support a different conclusion, it is not our role as the reviewing court to reweigh the evidence. (See *Kallman*, *supra*, 234 Cal.App.2d at pp. 96-97.)

Accordingly, we find no merit in SBI's contention that the trial court erred in denying SBI's claim for statutory prompt payment penalties.

### E. Attorney Fees

#### 1. Background

The concrete podium subcontract included the following attorney fees clause: "In the event the parties become involved in litigation or arbitration with each other arising out of this Subcontract or other performance thereof, in which the services of an attorney or other consultants are reasonably required, the prevailing party shall be entitled to recover all reasonable costs related to such proceeding including all costs incurred for reasonable attorney's fees and consultant's fees including any incurred on any appeal. In addition, in the event Contractor is required to defend any action arising out of or relating to Subcontractor's obligations hereunder, including any litigation or arbitration or other

27

legal proceeding, to the fullest extent allowed by law, Subcontractor shall pay costs incurred by Contractor including all reasonable attorney's fees and consultants fees, including any costs and fees on any appeal."

After judgment was entered, SBI filed a motion for attorney fees and costs. SBI argued that the broad language in the attorney fees clause in the concrete podium subcontract and the apartment contract, which provides for an award of attorney fees in the event the parties become involved in litigation arising from these contracts, includes claims in quantum meruit. SBI also argued that it was entitled to an award of attorney fees as the prevailing party under section 1717 since it had achieved its litigation goal of receiving payment for the services it had provided to 3rd Street/PWB. SBI did not apportion attorney fees between its claims, asserting that all claims in this matter were intertwined.

3rd Street/PWB opposed SBI's motion for attorney fees, arguing that section 1717 did not apply due to the trial court's ruling in the statement of decision that no contract existed between the parties. Additionally, 3rd Street/PWB maintained that attorney fees cannot be awarded on a recovery in quantum meruit; SBI was not the prevailing party in an action to enforce a contract; and the section 1717 provision for mutuality did not apply. Additionally, 3rd Street/PWB argued that SBI's failure to apportion its attorney fees claim among its different clients and claims was fatal to its attorney fees motion. 3rd Street/PWB also contended that the amount that SBI claimed for attorney fees was excessive.

The trial court denied SBI's motion for attorney fees, stating in the July 18, 2018 order that "[t]here was no contract between PWB and/or 3rd Street, on the one hand, and SBI, on the other hand, so there is no basis for an attorney fee award to SBI."

### 2. *The Parties' Contentions*

On appeal, SBI contends that the trial court erred because, even assuming that this court determines there is not a valid concrete podium subcontract, SBI is entitled to

28

attorney fees under the reciprocity provision of section 1717 because it defeated 3rd Street/PWB's claims arising from the concrete podium subcontract and the apartment contract. SBI also argues it is entitled to attorney fees under section 1717 because the trial court determined that SBI was the prevailing party in the litigation and awarded SBI damages.

3rd Street/PWB responds that the trial court properly exercised its discretion under section 1717 to deny SBI's motion for attorney fees because neither party prevailed on its contract claims and, in addition, attorney fees may not be awarded in an action to foreclose on a mechanic's lien release bond.

### 3. Analysis

The rules governing an award of attorney fees are well established. Under the "American rule," each party to a lawsuit ordinarily pays its own attorney fees. (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 751 (*Mountain Air*).) Code of Civil Procedure section 1021 allows parties to alter this rule by contract: " 'Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties . . . .' " Thus, " ' "[p]arties may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between themselves, whether such litigation sounds in tort or in contract." ' [Citation.]" (*Mountain Air*, *supra*, at p. 751; Code Civ. Proc., § 1021.)

Where the litigation sounds in contract, section 1717 governs the application of Code of Civil Procedure section 1021. Section 1717, subdivision (a) provides that "[i]n any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs."

29

"The primary purpose of section 1717 is to ensure mutuality of remedy for attorney fee claims under contractual attorney fee provisions." (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 610.) Therefore, where a contract provides the right to attorney's fees to only one party, "the effect of section 1717 is to allow recovery of attorney fees by whichever contracting party prevails, 'whether he or she is the party specified in the contract or not' (§ 1717, subd. (a) )." (*Id*. at p. 611.) Moreover, "[i]t is now settled that a party is entitled to attorney fees under section 1717 'even when the party prevails on grounds the contract is inapplicable, invalid, unenforceable or nonexistent, if the other party would have been entitled to attorney's fees had it prevailed.' [Citations.]" (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 870 (*Hsu*).)

Section 1717, subdivision (b)(1) defines the prevailing party on the contract as "the party who recovered a greater relief in the action on the contract." Under section 1717, subdivision (b)(1) the trial court "may also determine that there is no party prevailing on the contract for purposes of this section." (*Ibid.*)

In *Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1109 (*Scott Co.*) our high court provided guidance for the trial court's exercise of its discretion under section 1717, subdivision (b)(1) as follows: "When a party obtains a simple, unqualified victory by completely prevailing on or defeating all contract claims in the action and the contract contains a provision for attorney fees, section 1717 entitles the successful party to recover reasonable attorney fees incurred in prosecution or defense of those claims. [Citation.] If neither party achieves a complete victory on all the contract claims, it is within the discretion of the trial court to determine which party prevailed on the contract or whether, on balance, neither party prevailed sufficiently to justify an award of attorney fees." (*Scott Co.*, *supra*, at p. 1109, quoting *Hsu*, *supra*, 9 Cal.4th at p. 877.)

The standard of review is also well established. " ' "On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion. However, de novo review of such a trial court order is warranted where the determination of

30

whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law." ' [Citation.] In other words, 'it is a discretionary trial court decision on the propriety or amount of statutory attorney fees to be awarded, but a determination of the legal basis for an attorney fee award is a question of law to be reviewed de novo.' [Citations.]" (*Mountain Air*, *supra,* 3 Cal.5th at p. 751.)

In the present case, we determine the trial court did not abuse its discretion under section 1717, subdivision (b)(1) in denying SBI's motion for attorney fees. (See *Scott Co.*, *supra*, 20 Cal.4th at p. 1109.) As we have discussed, section 1717, subdivision (b)(1) provides that the trial court "may also determine that there is no party prevailing on the contract for purposes of this section." " '[T]ypically, a determination of no prevailing party results when both parties seek relief, but neither prevails, or when the ostensibly prevailing party receives only a part of the relief sought.' [Citation.]" (*Hsu*, *supra*, 9 Cal.4th at p. 875.)

Although SBI contends that it is the prevailing party under section 1717 because it defeated 3rd Street/PWB's claims for breach of the concrete podium subcontract and breach of the apartment contract, the record shows that SBI did not prevail on its own contract claim that 3rd Street/PWB owed SBI $674,759.53 under the concrete podium subcontract. Both the trial court's statement of decision and the order denying SBI's motion for attorney fees include the court's ruling that no contracts existed between the parties. Consequently, neither SBI nor 3rd Street/PWB obtained any relief on their contract claims. (See *Hsu*, *supra*, 9 Cal.4th at p. 875.) For that reason, the trial court did not abuse its discretion in implicitly finding that there was no prevailing party within the meaning of section 1717, subdivision (b)(1) and denying SBI's motion for attorney fees.

## IV.   3RD STREET/PWB'S APPEAL

On appeal, 3rd Street/PWB contends that the trial court erred in awarding SBI an additional $96,346, which was the amount SBI had paid in settlement of Largo's claims in this matter.

### A.   *Background*

In the statement of decision, the trial court found that SBI had reasonably mitigated its damages by resolving Largo's claims against SBI, as set forth in Largo's complaint that initiated this litigation, and SBI was therefore entitled to recover the settlement amount of $96,346 from 3rd Street/PWB.

During the trial court's ruling from the bench, the court explained its ruling as follows:  "And so the next question is can we find that . . . SBI is entitled to . . . quantum meruit because they did a lot of work.  And the answer to that is yes.  I think that they are entitled to quantum meruit.  I think they're entitled to damages for work that they performed. . . . [¶]  So based upon that I think that they're entitled to the reasonable value of the services that were performed and I accept SBI's damages  . . . . .  [¶]  And in addition to that, we have the Largo settlement. . . . .  I think that SBI did what it had to do.  It had to settle that.  It was, in effect, mitigating damages, really among other things.  That it was important that they get it resolved.  It had to be resolved in [*sic*] way or another.  Largo had no fault in any of this; Largo was simply a subcontractor.  So I think the resolution of the Largo settlement is also part of the damages.  That's roughly $96,346."

### B.   *The Parties' Contentions*

3rd Street/PWB contends that the trial court erred in awarding the additional amount of $96,346 to SBI because the damages recoverable under a theory of quantum meruit are limited to the reasonable value of SBI's services that either provided a direct benefit to 3rd Street/PWB or were provided at 3rd Street/PWB's request.  According to 3rd Street/PWB, SBI's payment of $96,346 in settlement of Largo's claims did not

provide a direct benefit to 3rd Street/PWB, and there was no evidence that 3rd Street had requested that SBI settle Largo's claims or that 3rd Street/PWB would reimburse SBI for the settlement.

According to SBI, the trial court did not err because, assuming this court determines that the concrete podium subcontract is unenforceable, the court properly awarded SBI $96,436 under a theory of noncontractual equitable indemnity since SBI asserted a cause of action for indemnity in its second amended cross-complaint. SBI also rejects 3rd Street/PWB's characterization of the award of $96,346 as part of SBI's recovery in quantum meruit.

SBI also argues that the theory of equitable indemnity may be raised on appeal because (1) the trial court's decision will be affirmed on any correct theory; and (2) equitable indemnity is a correct theory because it would be inequitable to force SBI to bear the costs of the Largo lawsuit when it was 3rd Street/PWB's wrongful refusal to pay SBI that caused SBI to be unable to pay Largo.

3rd Street/PWB disagrees, replying that SBI cannot raise a new theory of equitable indemnity on appeal and asserting that SBI's indemnity cause of action was based on contractual indemnity.

### C.  Analysis

At the outset, we determine that the trial court could not award SBI damages of $96,436 under a mitigation of damages theory, since that theory sounds in contract and the court had ruled that no contract existed between the parties. " 'The doctrine of mitigation of damages holds that "[a] plaintiff who suffers damage as a result of . . . a breach of contract . . . has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided." ' [Citation.]" (*Agam v. Gavra* (2015) 236 Cal.App.4th 91, 111.)

We also need not consider whether the amount of $96,436 was properly awarded as part of SBI's recovery in quantum meruit, since, as the parties agree, quantum meruit

33

does not apply since a recovery in quantum meruit is for the reasonable value of the services rendered. (See *Carmel Development*, *supra*, 48 Cal.App.5th at p. 523.) Here, it is undisputed that the award of $96,436 was the amount that SBI paid in settlement of Largo's claims.

We therefore turn to SBI's contention that the trial court could properly award SBI $96,436, in addition to the award of $489,026 in quantum meruit, under a new theory of equitable indemnity.[9] As we will discuss, we find merit in this contention.

" 'No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' [Citation.]" (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 (*D'Amico*).) We therefore consider whether equitable indemnity is a theory of law that is applicable to this case, in particular the award of $96,436 to SBI that the trial court expressly awarded as damages that SBI incurred in settling Largo's claims against SBI.

---

[9] During oral argument, 3rd Street argued for the first time that it was not liable under an indemnity theory because the indemnity cause of action in SBI's second amended cross-complaint is expressly alleged only against PWB. The indemnity cause of action in SBI's second amended cross-complaint states in part: "[SBI] is informed and believes and on that basis alleges that [SBI's] obligation to pay for the damages alleged in Plaintiff Largo's Complaint, if any, is due solely to the negligence, active fault, and/or primary liability of Cross-defendants PWB, and ROES 1-30 and each of them, and that [SBI's] obligations, if any, are only due to its passive fault, if any, and secondary action." Although the indemnity cause of action is alleged only against PWB, we note that the trial court ruled in the statement of decision that 3rd Street and PWB were agents of each other, and there was no substantive difference between them for purposes of this matter. 3rd Street did not object to the trial court's ruling, either during the proceedings below or in its briefing on appeal. Consequently, we find no merit in 3rd Street's argument that it is not liable because it was not named as a cross-defendant in SBI's indemnity cause of action.

34

"In general, indemnity refers to 'the obligation resting on one party to make good a loss or damage another party has incurred.' [Citation.] Historically, the obligation of indemnity took three forms: (1) indemnity expressly provided for by contract (express indemnity); (2) indemnity implied from a contract not specifically mentioning indemnity (implied contractual indemnity); and (3) indemnity arising from the equities of particular circumstances (traditional equitable indemnity). [Citations.]" (*Prince v. Pacific Gas & Electric Co.* (2009) 45 Cal.4th 1151, 1157, fn. omitted.)

"The right to equitable indemnity stems from the principle that one who has been compelled to pay damages which ought to have been paid by another wrongdoer may recover from that wrongdoer." (*Bush v. Superior Court* (1992) 10 Cal.App.4th 1374, 1380.) " ' "The elements of a cause of action for [equitable] indemnity are (1) a showing of fault on the part of the indemnitor and (2) resulting damages to the indemnitee for which the indemnitor is . . . equitably responsible." ' [Citation.]" (*C.W. Howe Partners Inc. v. Mooradian* (2019) 43 Cal.App.5th 688, 700 (*C.W. Howe Partners*).) Further, " 'a fundamental prerequisite to an action for partial or total equitable indemnity is an actual monetary loss through payment of a judgment or settlement.' [Citations.]" (*Western Steamship Lines, Inc. v. San Pedro Peninsula Hospital* (1994) 8 Cal.4th 100, 110 (*Western Steamship*).)

In the present case, the trial court ruled that 3rd Street/PWB owed SBI $489,026 to compensate SBI for the reasonable value of its services that 3rd Street/PWB had not paid. The evidence showed that since 3rd Street/PWB had not paid SBI all amounts owing for SBI's services, SBI was, in turn, unable to pay Largo for its services. Largo then filed a complaint alleging it had a subcontract with SBI to provide concrete podium work for the Third Street Apartments, which SBI breached by failing to pay Largo. Before the court trial in this matter, SBI resolved Largo's claims by paying a settlement of $96,436.

Based on this record, we determine that the theory of equitable indemnity is applicable to this case since (1) there was evidence of fault on the part of 3rd

35

Street/PWB, since the trial court found that 3rd Street/PWB owed SBI $489,026 for the reasonable value of its unpaid services (*C.W. Howe Partners*, *supra*, 43 Cal.App.5th at p. 700); and (2) there were resulting damages, consisting of SBI's payment of a settlement of $96,436 to Largo (*Western Steamship*, *supra*, 8 Cal.4th at p. 110).

For these reasons, we conclude that even if the trial court erred in awarding $96,436 in damages to SBI under a theory of mitigation of contract damages, we will uphold the award under the applicable theory of equitable indemnity. (See *D'Amico*, *supra*, 11 Cal.3d at p. 19.)

## V.    DISPOSITION

The judgment entered on February 5, 2018 is affirmed. The parties are to bear their own costs on appeal.

36

                                       _____

                                       ELIA, ACTING P.J.

WE CONCUR:


_____

BAMATTRE-MANOUKIAN, J.



_____

DANNER, J.


*SBI Builders*, *Inc. et al. v. Hartford Fire Insurance Company et al.*
H045715